# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA       . CRIMINAL NO. 13-10149-FDS
                               .
         V.                    . BOSTON, MASSACHUSETTS
                               . JULY 16, 2013
 EDWARD J. MacKENZIE, JR.       .
      Defendant                .
. . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF DETENTION HEARING
### BEFORE THE HONORABLE MARIANNE B. BOWLER
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:    UNITED STATES ATTORNEY'S OFFICE
                       BY:  Dustin Chao, Esq.
                       One Courthouse Way, Suite 9200
                       Boston, MA  02210
                       617-748-3100


For the defendant:     Robert M. Griffin, Esq.
                       Dhar Law LLP
                       1600 Providence Highway
                       Walpole, MA 02110
                       508-922-9794
                       rgriffin@dharlawllp.com


Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

**Government's:**

Jennifer Bucar     4          21

| EXHIBITS | DESCRIPTION | IN EVIDENCE |
|---|---|---|

Government's:

    1                      PowerPoint Exhibit 1-20     29

    2                      Jencks Material             29

3

1  CASE CALLED INTO SESSION

2  (2:27:40 p.m.)

3          THE CLERK:  Today is Tuesday July 16, 2013.  The

4  case of U.S. v. MacKenzie, Criminal Action No. 13-10149

5  will now be heard.  Will counsel please identify themselves

6  for the record?

7          MR. CHAO:  Good afternoon, Your Honor, Dustin

8  Chao for the United States.

9          THE COURT:  Thank you.

10          MR. GRIFFIN:  Good afternoon, Your Honor, Robert

11  Griffin on behalf of Mr. MacKenzie.

12          THE COURT:  Thank you very much.

13          Well we're here for the purposes of a detention

14  hearing.  Ready to proceed?

15          MR. CHAO:  Yes, Your Honor.

16          THE COURT:  Mr. Griffin?

17          MR. GRIFFIN:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. CHAO:  Your Honor, at this time the

20  government has provided Mr. Griffin with materials before

21  you which is quasi Jencks material which is Bate stamped 1

22  through 106 as well as a PowerPoint which I'll serve as the

23  detention hearing exhibit which has been marked by Mr.

24  Garvin and government shall call Agent Jennifer Bucar with

25  the FBI as its sole witness for the detention hearing.

4

1    THE COURT:  All right.  If you'll please come

2   forward and be sworn.

3       GOVERNMENT WITNESS, JENNIFER BUCAR, sworn

4       THE CLERK:  Could you just introduce yourself

5   spelling your last name for the record?

6       THE WITNESS:  Yup, Jennifer Bucar.  It's

7   B-U-C-A-R.

8       THE COURT:  And I'll ask you to keep your voice

9   up and speak into the microphone.

10                    DIRECT EXAMINATION

11  BY MR. CHAO:

12  Q.   Good afternoon, Agent Bucar.  Where are you currently

13  assigned?

14  A.   Boston.

15  Q.   And with what agency?

16  A.   With the FBI.

17  Q.   How long have you been with the FBI?

18  A.   A little over four years.

19  Q.   And what unit are you currently assigned to?

20  A.   In the civil rights public corruption squad.

21  Q.   Now are you familiar with an investigation involving

22  the defendant in this case Edward MacKenzie and a church

23  known as the Boston Society of the New Jerusalem?

24  A.   Yes.

25  Q.   Now I want to direct your attention to May 2, 2013 in

5

1   the vicinity of 130, 140 Bowdoin Street in Boston.  Do you

2   recall working that day?

3   A.   Yes.

4   Q.   And what was your assignment on that particular date?

5   A.   I was assisting the search warrant at that address.

6   Q.   And at that address that is where the Boston Society

7   of the New Jerusalem or Church on the Hill is located?

8   A.   Yes.

9   Q.   Now other than your participation in the search

10  warrant on May 2, 2013, is it true that you've had no other

11  direct involvement with this case pertaining to the

12  detention hearing?

13  A.   Correct.

14  Q.   Now for the purpose of this hearing have you become

15  familiar with certain aspects of this investigation?

16  A.   Yes.

17  Q.   And have you done that through conversations with

18  other FBI and agents with the IRS?

19  A.   Yes.

20  Q.   And have you also reviewed materials that's before you

21  as U.S. v. MacKenzie detention hearing Bates 1 through 106

22  as well as a PowerPoint outline which is pages one through

23  20?

24  A.   Yes.

25  Q.   Have you also reviewed the indictment in this case

6

1  which is part of the initial package of materials?

2  A.   Yes.

3  Q.   Now can you briefly describe for the Court what was

4  the scheme in which Mr. MacKenzie was involved and charged

5  in the instant indictment?

6  A.   The scheme centered on the Boston Society of new

7  Jerusalem Church which has a yearly net income of about

8  $1.4 million.  Back in 2002, well the church was run by a

9  small Board that was mostly elderly individuals.  Back in

10  2002 MacKenzie planned to have himself and his friends and

11  family become, join the church and then become voting

12  members and over time vote out the old board and then vote

13  themselves into positions of power of authority so that

14  they could dictate where the money that the church was

15  earning went.

16  Q.   And through this scheme as charged in the indictment

17  was MacKenzie involved in taking approximately $1 million

18  in the form of bribes, kickbacks and other embezzlement

19  from the Church on the Hill?

20  A.   Yes.

21  Q.   Now again what you mentioned as far as the manner and

22  means of the conspiracy is that located on, before you as

23  Exhibit 2 of the detention hearing and that would be

24  paragraphs 11 and 12 of the instant indictment with respect

25  to replacing the elderly members of the church?

7

1   A.    Yes.

2   Q.    Now drawing your attention to detention hearing page

3   three was there a particular method in which MacKenzie

4   tried to instill his influence with these elderly church

5   members?

6   A.    Yes, MacKenzie would verbally intimidate and threaten

7   the members and then also he has this book called Street

8   Soldier that he would hand out as kind of like a nonverbal

9   way to intimidate the members.

10  Q.    And have you reviewed certain excerpts of this book

11  called Street Soldier?

12  A.    Yes.

13  Q.    And is the cover of this book Street Soldier depicted

14  in detention hearing Exhibit 4?

15  A.    Yes.

16  Q.    Now have you reviewed some of the excerpts that have

17  been included in the Jencks material on Jencks Bates No. 75

18  through 83 which are excerpts from that book?

19  A.    Yes.

20  Q.    And based upon your review of certain excerpted parts

21  of the Street Soldier book, do you have any knowledge with

22  respect to whether this defendant in his past was able to

23  either possess or gain access to firearms?

24  A.    Yes, in the book he refers to that.

25  Q.    Now I draw your attention specifically to detention

8

1   hearing Exhibit 5.  Have you reviewed this photograph?

2   A.   Yes.

3   Q.   And can you just for the record identify to the Court

4   which was, which person is MacKenzie?

5   A.   He's in the middle.

6   Q.   And what is he holding?

7   A.   He's holding an automatic gun that the caption calls a

8   HK-91 assault rifle.

9   Q.   And have you also had the opportunity to review a

10  certain excerpt of the book which is going to be on

11  detention hearing Exhibit page six which are pages 142 and

12  143 from the Street Soldier book?

13  A.   Yes.

14  Q.   And did that incident involve an act of violence

15  involving the defendant using a cinderblock as a weapon?

16  A.   Yes.

17  Q    And did you have the opportunity to listen to a radio

18  interview that Mr. MacKenzie gave on WKRO on or about June

19  24, 2011 with the host Todd Feinburg?

20           THE COURT:  June 24, 2011, correct?

21           MR. CHAO:  Yes.

22  A.   Yes.

23  BY MR. CHAO:

24  Q.   And is that a fair and accurate recording of the

25  excerpt of the interview Mr. MacKenzie gave with Mr.

9

1   Feinburg?

2   A.   Yes.

3        MR. CHAO:  And with the Court's permission I'd

4   like to just play that excerpt of that interview?

5        THE COURT:  And does that appear in text in this

6   packet?

7        MR. CHAO:  Yes, Your Honor.  It's not a verbatim

8   transcript but in Street Soldier he recounts this

9   cinderblock incident and on June 24, 2011 he proceeds to

10  talk about it.

11  (TAPE PLAYED FOR COURT)

12  BY MR. CHAO:

13  Q.   Now in the course of your preparation for this

14  hearing, Agent Bucar, are you familiar with the defendant's

15  prior federal conviction for narcotics distribution or

16  about January 21st of 1993?

17  A.   Yes.

18  Q.   And do you recall, just directing your attention to

19  Exhibit No., page 7, do you recall the sentence that this

20  defendant received for the narcotics cocaine distribution

21  case?

22  A.   He received probation for four years.

23  Q.   So that would be from January `93 to January `97,

24  correct?

25  A.   Correct.

1  Q.   Now drawing your attention to detention hearing

2  exhibit page 8, are you familiar with the fact that Mr.

3  MacKenzie discussed being on federal probation in the

4  Street Soldier book?

5  A.   Yes.

6  Q.   And are you familiar with the paragraphs on page 210

7  in the Street Soldier which are shown in the Exhibit 8 with

8  respect to an incident involving a cup of coffee?

9  A.   Yes.

10  Q.   Now could you just read those paragraphs out loud?

11  A.   Probation notwithstanding I had opened Steve's eyes a

12  little.  I headed over to Dunkin' Donuts and bought a cup

13  of coffee for $1.24 medium black scalding hot.  Then I head

14  back to Carolyn's place.  Steve was still in his car

15  sleeping like a baby.  The window was down and he had his

16  head against the door, hands under his cheeks.  I poured

17  the hot coffee down the side of his face making sure to get

18  some in his eyeballs.  He jerked awake like he was on fire

19  and I leaned in pulling him close to my face.  If you ever

20  touch or disrespect the mother of my kids again I said real

21  clearly I will fucking burn you alive.  Remember you

22  motherfucker the next time it will be gasoline.  I swear if

23  I'd had enough money to buy the gasoline that day that's

24  what I would have done.  I would have soaked him down,

25  stood there with a lighter and let him know exactly how

1  vulnerable he was but I'd only had $1.30 so the coffee

2  had to do.

3  Q.   And did Mr. MacKenzie also recount how he was going to

4  deal with this so-called Steve as a witness notwithstanding

5  his probation?

6  A.   Yes.

7  Q.   And can you read aloud that final paragraph on page

8  Exhibit 8?

9  A.   I was eventually charged with mayhem, assault and

10  battery and attempted murder so I sent a very loud message

11  through some friends.  They told Steve that they knew where

12  his parents lived and that he was making a big mistake

13  because any time they saw him they'd hit him with a

14  baseball bat.  He dropped the charges and everything was

15  dismissed.

16  Q.   Now have you reviewed a police report that's also part

17  of detention hearing Exhibit 8 that relates to this

18  specific incident involving the hot coffee?

19  A.   Yes.

20  Q.   And based upon your review of the police report and

21  detention hearing 8 were you able to determine what the

22  ultimate result of this case was?

23  A.   Yes, it was dismissed.

24  Q.   And was that shown on his criminal record which is

25  going to be on the Jencks top of page 51?

12

1   A.   Yes.

2   Q.   And based upon your view of the police report and

3   detention hearing 8, were you able to determine what the

4   ultimate result of this case was?

5   A.   Yes, it was dismissed.

6   Q.   And was that shown on his criminal record which is

7   going to be on the Jencks top of page 51?

8   A.   Yes.

9   Q.   Now I want to draw your attention to detetniion

10  hearing 9, are you aware based on a review of his criminal

11  record that Mr. MacKenzie was convicted for filing a false

12  insurance claim in or about December 1st of 2003?

13  A.   Yes.

14  Q.   And did you review police reports relating to a

15  witness for this false insurance case contained on pages 98

16  through 99 of the Jencks also on hearing exhibit page 10?

17  A.   Yes.

18  Q.   Now can you tell us this witness, for this insurance

19  case who was this witness?

20  A.   It was Carla MacKenzie, Eddie MacKenzie's ex-wife.

21  Q.   And based upon your review of that police report can

22  you tell us what Mr. MacKenzie did or said to Carla when he

23  learned that Carla MacKenzie was a potential witness on the

24  insurance fraud case?

25  A.   Yes.  The report says that he called her and told her

1  over the phone that if she ever testified against him he

2  would have her legs chained to a cinderblock; have her

3  thrown over a bridge.  He also swore on his kids' life that

4  he would kill her if she testified.  This left Carla fear

5  for her safety.

6  Q.   And based upon your review of Mr. MacKenzie's criminal

7  record which is on Jencks 48 towards the bottom of that

8  page, did you later learn the result of this case involving

9  his ex-wife Carla MacKenzie?

10  A.   Yes.

11  Q.   And what was the result?

12  A.   Dismissed.

13  Q.   Now I want to draw your attention to the instant case

14  on hearing exhibit, page 11 and I direct you, which is

15  indictment, the indictment page 23 paragraph 40, are you

16  familiar with the extortion count which is charged against

17  Mr. MacKenzie?

18  A.   Yes.

19  Q.   And have you reviewed reports that relate to this

20  specific victim of that extortion count who's identified as

21  carpenter No. 2?

22  A.   Yes.

23  Q.   Now have you reviewed a grand jury transcript relating

24  to carpenter No. 2's testimony to a grand jury on January

25  22nd of 2013?

1   A.   Yes.

2   Q.   And is what's before you on detention hearings 12 and

3   13 statements that carpenter No. 2 made to the grand jury?

4   A.   Yes.

5   Q.   And can you please just read them aloud for the

6   record?

7   A.   "I took my old phone and I went down.  I was driving

8   and I hit, it was supposed to be blank but it was Eddie

9   MacKenzie's.  Everything is in alphabetical order on your

10  phone when you program it on.  So I was driving, I hit it,

11  ding-a-ling, hello.  I'm like hey blank, how you doing?

12  Mother fucker I'm your worst nightmare.  Mother, you're

13  going to fucking die and on and on he went.  And I'm like

14  who's this, blank?  I thought it was blank's son.  He had a

15  problem with drugs and alcohol.  Who's this, blank

16  motherfucker, bah, bah.  I said who's this, who's this and

17  he goes hey blank, how you doing.  No matter what happens I

18  still love you.  How's the wife and kids.  I said fine

19  Eddie.  Eddie, I'm sorry, I didn't mean to call you and

20  hung up on him."

21  Q.   And did the carpenter No. 2 communicate to the FBI

22  what he felt after this conversation with Ed MacKenzie on

23  or about October 17th of 2012?

24  A.   Yes.  He--

25  Q.   Go ahead, I'm sorry.

1  A.    He felt threatened and feared for his safety after

2  that phone call.

3  Q.    Now are you aware of any other attempts that Mr.

4  MacKenzie made to contact carpenter No. 2 including by

5  third parties?

6  A.    Yes.

7  Q.    Now I draw your attention to hearing exhibit, page 14.

8  Are you familiar with a confidential source for the drug

9  enforcement administration?

10  A.    Yes.

11  Q.    And as you see is this the criminal record pertaining

12  to that DEA source?

13  A.    Yes.

14  Q.    And he has a prior conviction for a narcotics

15  distribution, correct?

16  A.    Correct.

17  Q.    And based upon the FBI's investigation of this case

18  did you later learn the last four digits of the phone

19  number of this confidential source?

20  A.    Yes.

21  Q.    And what was that?

22  A.    9-7-7-5.

23  Q.    And did you also learn the last four digits of Mr.

24  MacKenzie's cellphone number?

25  A.    Yes.

1  Q.    And what was that?

2  A.    7-6-6-2.

3  Q.    Now I want to draw your attention to hearing exhibit,

4  page 15.  On or about February 14th of 2013 can you tell us

5  what, if any, meeting occurred on that date?

6  A.    The DEA source met with DEA agents and told them that

7  a few days earlier he or she had contact with MacKenzie and

8  MacKenzie said that he was aware that the FBI and IRS was

9  investigating him.

10 Q.    And what did the DEA believe was the purpose of the

11 confidential sources questions regarding Edward Mackenzie?

12        MR. GRIFFIN:  Objection, Your Honor.

13        THE COURT:  Rephrase it.

14 BY MR. CHAO:

15 Q.    What, if any, communications did you learn with

16 respect to the confidential source and the DEA?  What was

17 the substance of that conversation?

18 A.    Between the source and the DEA?

19 Q.    When the source went to meet the DEA what was, again

20 what was the purpose of that conversation?

21 A.    The agents felt that the purpose was for the--

22        MR. GRIFFIN:  Objection, Your Honor.

23        THE COURT:  As to what they felt sustained.

24        MR. CHAO:  I'll move on.

25 BY MR. CHAO:

1  Q.    Agent Bucar can you tell us on that same or on or

2  about that same date of February 14, 2013 after this source

3  met with the DEA who he contacted?

4  A.    Telephonically he was contacted by Eddie MacKenzie.

5  Q.    And is that, a record of that call shown in Exhibit

6  15?

7  A.    Yes.

8  Q.    Now I want to draw your attention back to the search

9  warrant in this case on or about May 2nd of 2013, draw your

10 attention again to carpenter No. 2.  Who contacted

11 carpenter No. 2 on or about May 2, 2013 around the date of

12 the search warrant?

13 A.    The DEA source.

14 Q.    Now I want to draw your attention now to hearing

15 exhibit, page 17.  Are you familiar with the exhibit before

16 you as page 17?

17 A.    Yes.

18 Q.    And is that a post judgment settlement payment

19 agreement between Edward MacKenzie and an individual named

20 Robert Zadankowski (phonetic)?

21 A.    Yes.

22 Q.    And based upon your conversations with other FBI

23 agents in this case what happened to cause Mr. MacKenzie to

24 agree to pay the Zadankowski's approximately $1,000 per

25 month?

18

1  A.   Back in the early `90s the Zankowskis (sic) are an

2  elderly couple.  In the early `90s they were in their 50s--

3        MR. GRIFFIN:  Objection, Your Honor.

4        THE COURT:  No, she may answer.

5  A.   Early `90s they were in their 50s on the brink of

6  retirement.  They owned a bar in the South End that they

7  sold and were told by a realtor that a bar called

8  Connolly's Corner Café was for sale in South Boston.  They

9  proceeded with trying to buy it.  They were introduced to

10 Eddie MacKenzie who portrayed himself as the owner of

11 Connolly's Corner Café and then over time they paid money

12 into an escrow account thinking that they were going along

13 the process of purchasing Connolly's Corner Café.  In the

14 end Mackenzie was not the owner.  The whole thing was a

15 seeming fraud and Zankowski's had to file this suit.

16       MR. GRIFFIN:  Objection, Your Honor.

17        THE COURT:  Sustained as to that portion the

18 whole thing was a seeming fraud.

19 BY MR. CHAO:

20 Q.   Agent Bucar, based on your view of the paperwork

21 involved in the Zadankowski case did Edward MacKenzie

22 actually in fact own the corner café?

23 A.   No.

24 Q.   Or did he have authority to unilaterally sell the

25 corner café?

1  A.    No.

2  Q.    And did he have permission and authority to take money

3  that was placed in a purchase escrow account by Zadankowski

4  for the purchase of that café?

5  A.    No.

6  Q.    Now I want to draw your attention to detention hearing

7  page 18.  Are you familiar with the Van Bober (ph) fraud

8  case?

9  A.    Yes.

10 Q.    And can you just basically tell us what happened in

11 this Van Bober fraud case?

12 A.    Elizabeth Van Bober was an elderly woman and in the

13 early 2000s she was introduced to Eddie Mackenzie.  He

14 proceeded to befriend her and wined and dined her so to

15 speak.  She shared information with him that her son went

16 missing in 1991 and she still believed that he was alive.

17 So Mackenzie took money from Van Bober so that he could go

18 find the son and bring him home.

19         MR. GRIFFIN:  Objection, Your Honor.

20         THE COURT:  Overruled.

21 A   In the end he took her money and never was able to

22 convince her that he was really looking for her son and

23 also along the way--

24         MR. GRIFFIN:  Objection, Your Honor.

25         THE COURT:  Sustained.

1  BY MR. CHAO:

2  Q.   Agent Bucar,m I want to draw your attention to

3  detention hearing Exhibit 19.  Was Mr. MacKenzie criminally

4  charged in connection with his interaction with Elizabeth

5  Van Bober?

6  A.   Yes.

7  Q.   And have you reviewed his, Mr. MacKenzie's criminal

8  record with respect to this particular crime against

9  Elizabeth Van Bober?

10  A.   Yes.

11  Q.   And can you tell us based upon your view of that

12  criminal record what was the sentence that Mr. MacKenzie

13  received on the Van Bober case?

14  A.   Three years' probation.

15  Q.   And was that running from approximately September 2004

16  through I guess it would be January of, no I'm sorry,

17  October of 2007?

18  A.   Yes.

19  Q.   Finally, I want to draw your attention to hearing

20  exhibit, page 20.  Did you have an opportunity to review

21  what's before you as a June 24, 2013 email from

22  representatives of the church?

23  A.   Yes.

24  Q.   And what did they communicate in that email with

25  respect to their concerns if Mr. MacKenzie were to be

21

1  released in the instant case?

2         MR. GRIFFIN:  Objection, Your Honor.

3         THE COURT:  Basis?

4         MR. GRIFFIN:  There's no authentication of who

5  sent this email.

6         THE COURT:  Overruled.

7  A.   They communicated in the email that they feared for

8  the safety of their members if MacKenzie was released.

9         MR. CHAO:  I have no further questions.  Thank

10 you.

11        THE COURT:  Cross examination?

12                    CROSS EXAMINATION

13 BY MR. GRIFFIN:

14 Q.   Agent the only role that you had I believe you

15 testified on direct examination in this case was you

16 assisted in executing the search warrant, correct?

17 A.   Correct.

18 Q.   Okay.  So you had no involvement in the actual

19 investigation of the case?

20 A.   No.

21 Q.   You had no interview with any percipient witnesses to

22 the case?

23 A.   No.

24 Q.   You had no discussions with anyone relative to any

25 conduct of Mr. MacKenzie's, correct?

1    A.    Not that I remember.

2    Q.    And have you reviewed any of the lists of the

3    government's witnesses in the case?

4    A.    No.

5    Q.    All right.  Are you aware that Thomas Desrosiers is

6    listed as a witness?

7    A.    No.

8    Q.    Were you aware that he was granted immunity in

9    exchange for his testimony?

10   A.    No.

11   Q.    How about David Doherty, were you aware that he was a

12   witness and he was granted immunity for his testimony?

13   A.    No.

14   Q.    Were you aware that Thomas Camby was charged in

15   connection with his conduct in this case and entered a plea

16   agreement that included cooperation and testimony against

17   Mr. MacKenzie?

18   A.    No.

19   Q.    Were you aware that Martin Rafall also was given a

20   plea agreement and, that included testimony against Mr.

21   Mackenzie for his cooperation in this matter, are you aware

22   of that?

23   A.    I'm aware of that.

24   Q.    All right.  And Martin Rafall, are you aware that he

25   was given a plea agreement for his conduct in connection

23

1   with this case and also in exchange for his cooperation

2   in testifying against Mr. MacKenzie?

3   A.    Yes.

4   Q.    And you're aware that Steven Richmond was also granted

5   immunity in exchange for his testimony, correct?

6   A.    No, I don't remember that name.

7   Q.    Okay.  Well all of these individuals are listed as

8   government witnesses, are you aware of that?

9   A.    I am now.

10  Q.    Okay.

11  A.    With your reading them.

12  Q.    If I show you a document a list that shows that

13  they're listed would that help you?

14  A.    I mean I don't, I wasn't aware of this before you read

15  it to me.

16  Q.    Okay.  Well do you want to take a look at this then?

17  A.    Sure.

18          MR. GRIFFIN:  And for the record that's a

19  discovery letter that was provided to the defendant by the

20  government.

21  A    Okay.

22  BY MR. GRIFFIN:

23  Q.    So you're aware, you're now aware of those individuals

24  and their statuses in the case?

25  A.    Yes, sir.

1  Q.   Now you discussed on direct examination some

2  instances of Mr. MacKenzie's behavior relative to this book

3  Street Soldier, correct?

4  A.   Correct.

5  Q.   All right.  And you're aware that that was written in

6  conjunction with a ghost writer, correct, a Sara Karas?

7  I'm sorry, Phyllis Karas, I stand corrected.

8  A.   I'm aware that both names are on the cover of the

9  book.

10 Q.   Okay.  And the conduct that's described in that book

11 is conduct that's described during the timeframe of the

12 1980s, correct?

13 A.   Yes.

14 Q.   All right.  And nothing that you spoke about that's

15 contained in that book pertains to anything beyond 1990,

16 correct?

17 A.   I feel like it does go into the `90s some of the

18 contents of the book.

19 Q.   Shortly into maybe, maybe `91 or `92, right at the

20 outside?

21 A.   I feel comfortable saying not after `99.

22 Q.   Well in – okay, then--

23        MR. GRIFFIN:  Can I have just a minute, Your

24 Honor?

25        THE COURRT:  Take your time.

25

1      PAUSE

2    BY MR. GRIFFIN:

3    Q.   The picture you refer to of the defendant with a

4    firearm, do you know when that picture was dated?

5    A.   I do not.

6    Q.   But it's a picture that comes from the book, correct?

7    A.   Yes, sir.

8    Q.   So it's fair to say that that came from sometime in

9    the `80s, the early `90s, correct?

10   A.   Fair to say, yes.

11   Q.   And the last time that Mr. Mackenzie was charged with

12   any type of criminal behavior was in December of 2003, I'm

13   sorry, October I believe of 2003, correct?

14   A.   2003, yes.

15   Q.   And he was given probation, correct?

16   A.   Correct.

17   Q.   And he successfully completed that probation.  It was

18   terminated.  There's no violation notices, no surrender

19   proceedings that are indicated on the Board of Probation

20   printout, correct?

21   A.   Not that I'm aware of, yes.

22   Q.   And you referred his indictment in this court in 1990

23   for conspiracy to violate Controlled Substance Acts to

24   distribute cocaine, correct?

25   A.   Correct.

1   Q.   And you're aware that he was released on pretrial,

2   released pretrial on that case for a period of eight and a

3   half to nine months, correct?

4           The COURT:  By this Court?

5           MR. GRIFFIN:  Yes, by this Court.

6   A   Yes, sir.

7   BY MR. GRIFFIN:

8   Q.   And that there were no violations of his pretrial

9   release during that timeframe, correct?

10  A.   To the best of my knowledge, yes.

11  Q.   And he successfully completed probation without any

12  incidents, correct?

13  A.   Correct.

14  Q.   So probation was terminated and he had no violations,

15  correct, to the best of your knowledge?

16  A.   Correct.

17  Q.   Now the email that you referred to in the government's

18  PowerPoint Exhibit No. 20, you never spoke to anybody about

19  who authored that email, correct?

20  A.   No, sir.

21  Q.   You don't know who authored that email, do you?

22  A.   No, sir.

23  Q.   You don't know if it was authored by anybody from the

24  church do you?

25  A.   No, sir.

1   Q.   And a review of, you've reviewed Mr. Mackenzie's

2   criminal record, correct?

3   A.   Correct.

4   Q.   And except for a default back in 1978 do you see any

5   other instances of his failure to appear for a court

6   appearance when he's been required to do so?

7   A.   To the best of my knowledge no.

8   Q.   So he's never defaulted on anything as far as you know

9   except for that one--

10   A.   As far as I know.

11   Q.   Except that one matter, correct, in 1978?

12   A.   Correct.

13   Q.   And as far as your description of Mr. MacKenzie's

14   activities with the New Jerusalem Church, and you're aware

15   that he was there for approximately 11 years, correct?

16   A.   Correct.

17   Q.   And he was employed there in various capacities for

18   that period of time, correct?

19   A.   Yes.

20   Q.   Okay.  Now can you tell this Court what initiated the

21   investigation into Mr. Mackenzie and his employment status

22   with that church?

23   A.   I cannot.  I don't know the information.

24   Q.   So you don't even know how the investigation started?

25   A.   I do not.

1  Q.   And you don't know if for instance any of these

2  witnesses whose names I showed you on that discovery letter

3  you don't know if they came to the FBI or if the FBI went

4  to them, do you?

5  A.   No.

6  Q.   You have no idea how the investigation began?

7  A.   No.

8  Q.   Now you described how Mr. MacKenzie planned a takeover

9  as you described it in your direct testimony.  What have

10 you reviewed that reveals a plan or a scheme by Mr.

11 MacKenzie to take over the church?

12 A.   The indictment.

13 Q.   Just the indictment.  So you have nothing other, you

14 know of nothing else other than the allegations contained

15 in the indictment that leads you to believe that he planned

16 and schemed to take over the church?

17 A.   Correct.

18         MR. GRIFFIN:  I have no further questions, Your

19 Honor.

20         THE COURT:  And redirect?

21         MR. CHAO:  No, Your Honor.

22         THE COURT:  You may step down then.

23         Further witnesses for the government?

24         MR. CHAO:  No, Your Honor.

25         THE COURT:  Witnesses for the defendant?

1    MR. GRIFFIN:  I do have some exhibits I care to

2  enter, Your Honor.

3    THE COURT:  All right.  And as for the government

4  exhibits have they been formally offered?

5    MR. CHAO: Your Honor, the government offers

6  what's before you as detention hearing Exhibit 1 which,

7  consists of page one through 20 in the PowerPoint exhibit.

8  Thank you, Your Honor.  That's just the Jencks material.

9  You know, for the sake of completeness the government will

10 offer the Jencks material as well which is Bate stamped

11 page one through 106 as Exhibit No. 2.

12    THE COURT:  All right.

13    government Exhibit Nos. 1 and 2, admitted

14    MR. GRIFFIN:  May I approach, Your Honor?

15    THE COURT:  Mr. Griffin, you may.

16    PAUSE

17    THE COURT:  And you've provided it to your

18 brother I take it?

19    MR. GRIFFIN:  I have, Your Honor.

20    THE COURT:  All right.

21    All right, I'll hear argument.

22    MR. GRIFFIN:  Your Honor,--

23    THE COURT:  Well usually I hear from the

24 government first.  Okay.

25    MR. CHAO:  Your Honor, the government is moving

30

1   for detention firstly under the prong of 3142(f)(1)(A)

2   because this defendant is simply charged with a crime of

3   violence and the Hobbs Act extortion count contained in

4   Count 6 of the indictment which is on page 34 where this

5   defendant threatened physical harm against carpenter No. 2

6   if he would not pay a cash kickback to MacKenzie.  And,

7   Your Honor, as the government has emphasized the threats

8   from this particular defendant were not empty threats but

9   rather these threats from Mr. MacKenzie are backed up with

10  a lifetime of violence, violence that this defendant

11  perpetrated for money, violence that this defendant

12  perpetrated for status and violence that this defendant

13  perpetrated for pleasure.  And even more alarmingly, Your

14  Honor, this defendant, it should come as no surprise that

15  when this defendant was committing those crimes of violence

16  he was indiscriminate when he chose his victims.  As

17  recounted in the Street Soldier book and the excerpts

18  provided to the Court this defendant beat up his peers.

19  This defendant beat up women and this defendant chose

20  victims to beat based upon their sexual orientation.  The

21  defendant is a true danger to the safety of the community.

22  And it's no surprise that when there was a victim that

23  dared to refuse to pay a cash kickback to Mr. MacKenzie he

24  relied upon the one tool, the tool that's never left his

25  side which is the tool of violence.

1          Now under 3142(f)(2)(B) the government's moving

2    for detention under this prong as well because there is a

3    serious risk that this defendant will either obstruct or

4    attempt to obstruct justice or threaten, injure or attempt

5    to intimidate a perspective witness in this case.  Now as

6    this hearing has demonstrated Mackenzie has a history of

7    intimidating witnesses.  The victims that have witnessed

8    his wrongdoing were all subjects of his terror and Mr.

9    MacKenzie through his intimidation of the witnesses as

10   shown in the exhibits has gotten away with it.  In 1995

11   after this defendant sought to burn the face of the

12   boyfriend of his ex-wife he then chose to threaten him

13   through his friends with a baseball bat and mentioned his

14   family.  In 2002 when Mr. MacKenzie learned that another

15   ex-wife was cooperating with the state prosecutors he

16   threatened to tie her to a cinderblock and throw her over a

17   bridge, swore on his children's life that he would kill her

18   if she testified and to no one's surprise--

19          THE COURT:  Look, in the gallery if you want to

20   have a conversation go out.  Is that clear?

21          UNIDENTIFIED INDIVIDUAL:  Yes, Your Honor.

22          THE COURT:  All right.  I'm sorry, Mr. Chao.

23          MR. CHAO:  No problem, Your Honor.  And to no

24   one's surprise both of those cases went away.  But perhaps

25   the most alarming thing is the contrast to those two cases

32

1  of intimidation in 1995 where he's charged with assault

2  and he faces a prison sentence of maybe one or two years or

3  a suspended sentence he chose to threaten the victim's

4  family with a baseball bat.  In 2002 when he was faced with

5  a crime that would give him three years' probation he

6  threatened to throw his wife over a bridge.  Now in this

7  case, Your Honor, this defendant faces a criminal sentence

8  of up to 25 years in prison for a federal RICO conviction;

9  not two years on assault, not three years of probation on

10 insurance fraud, 25 years, a RICO investigation that's

11 built upon years of investigation, grand jury testimony and

12 numerous witnesses.  If the defendant's history is any

13 guide there are no lengths of the threats that this

14 defendant would be willing to resort in the instant case.

15 And sure enough pre-indictment when this defendant had an

16 opportunity to an unguarded conversation with a witness in

17 this case, carpenter No. 2, he saw fit not only to use

18 expletives against carpenter No. 2 but once again to bring

19 up his family.

20        Now the defendant wants, defense wants to

21 highlight the fact that this defendant is not been

22 convicted or caught in recent years of committing acts of

23 violence, but this fails to account for this defendant's

24 calculated use of his violent criminal past to cast a

25 threat of violence over every member of that church for the

33

1  past 10 years.  And this also fails to account for the

2  fact that economic harm or pecuniary harm as Your Honor's

3  aware may be considered any dangerous calculation for bail

4  purposes.  As cited by the Third Circuit in *Provenzano*

5  (ph), the Ninth Circuit in *Reynolds*, economic harm

6  constitutes danger to the community.  And as further

7  support district courts in this district have adopted the

8  reasoning that economic harm is dangerousness and district

9  of Rhode Island cases of the *United States v. DeSimone* in

10  2009 and *United States v. Manokio* in 2011.

11     Now the economic harm that the defendant chose to

12  commit is significant in this case for two reasons.  First,

13  the economic harm that this defendant committed was

14  committed while this defendant was--

15     THE COURT:  Is it not clear what I said?  One

16  more move like that and you're out of the courtroom.

17     COURT OFFICER:  Which one, Your Honor?

18     THE COURT:  Well, gentleman, in the blue shirt

19  and the defendant having communication.  So enough.

20     UNIDENTIFIED:  I apologize a second time.

21     MR. CHAO:  First, Your Honor, the economic harm

22  that the defendant caused was committed while he was either

23  serving federal or state probation.  When the defendant was

24  on federal probation for narcotics trafficking he swindled

25  the Zadankowskis.  When the defendant was on state

34

1  probation for insurance fraud he was stealing from a 73-

2  year-old-woman who just suffered from a stroke, Elizabeth

3  Von Bober.  And while the defendant was on probation for

4  insurance fraud from stealing from Van Bober with respect

5  to the fraud in that case he was business stealing

6  approximately $1 million from the church.  So this

7  defendant has shown from his past when he's permitted to

8  remain at large even under court supervision he sees fit to

9  commit more crime.

10       And second, Your Honor, the economic harm that

11 this defendant has committed is particularly galling in the

12 fact that this defendant has chosen some of the most

13 vulnerable members of our community, the elderly.  In the

14 *Zadankowski* case he stole the victim's retirement nest egg

15 by trying to sell a café he didn't own.  In the Bober case

16 again, as I said he found a 73-year-old-woman who had died

17 three years after the resolution of the case who was just

18 recovering from a stroke and he stole thousands upon

19 thousands of dollars from her.  In the instant case the

20 defendant found an elderly church community that he could

21 cower, cheat, and steal from for over 10 years.

22       Now the defendant makes a point to say that this

23 defendant has not been involved with any acts of violence

24 over the last 10 years, that he's lived a peaceful life,

25 that he's been minding his own business.  Well if that's

35

1   true that he's been minding his own business living a

2   peaceful life for 10 years, why is it that the people that

3   work with him in that church every day for those last 10

4   years fear for their safety, Your Honor?  They don't fear

5   for money.  They don't fear for property.  They fear for

6   their safety.  And, Your Honor, the government proffers

7   that this email came from representatives of the church

8   unprompted.  This Court basically has received a plea from

9   the members of the church who have cowered in fear to this

10  Street Soldier for the past decade and now at this very

11  hearing pursuant to the Victim Rights Act these church

12  members who feel the courage now that MacKenzie is

13  incarcerated to say what they couldn't say for the last 10

14  years, that they feel that their safety is threatened by

15  MacKenzie.

16       Now, Your Honor, for all the forgoing reasons the

17  evidence adduced at this hearing the government believes

18  has shown by overwhelming evidence and at the minimum clear

19  and convincing evidence pursuant to the statute that this

20  defendant is a danger to the community and respectfully

21  request that this defendant be detained.

22       THE COURT:  Mr. Griffin?

23       MR. GRIFFIN:  Your Honor, I would suggest to the

24  Court that the government has overstated the evidence that

25  has been presented here today.  There's no indication

36

1   through direct evidence that the defendant has engaged in

2   any criminal conduct since his arrest in 2003.  Your Honor,

3   the defendant has been living a life with his children in

4   Weymouth.  He lives with his 19- and his 20-year-old-

5   daughter.  He's 55 years of age.  He's a lifelong resident

6   of Massachusetts in the Boston area.  The government, Your

7   Honor, is trying to detain Mr. MacKenzie based on behavior

8   that was committed back in the `80s and the `90s.  I would

9   suggest, Your Honor, that at the very best what the

10  government has laid out in the indictment is an

11  embezzlement and larceny charge.  I would suggest to the

12  Court that the case is overcharged.  There's no evidence

13  that any of these discussions with this carpenter were ever

14  recorded.  There's no indication that any of the

15  conversations with the confidential source of the DEA were

16  ever recorded.  This is all the word of people who have

17  been confronted by the FBI with their own criminal conduct

18  and with their own criminal conduct confronting them they

19  point their finger at somebody else and they make these

20  allegations that it was him and he's an easy target because

21  he was foolish enough to have written that book.  And he

22  was foolish enough to have embellished his behavior in that

23  book.

24          Your Honor, I would suggest that the defendant

25  who owns property in Weymouth, lives in a townhouse with

37

1    his daughters, has significant ties here, poses no threat

2    to the community at large.  He poses no risk of flight,

3    Your Honor.  And I would respectfully request that the

4    Court release Mr. MacKenzie pretrial.

5            MR. CHAO:  I have nothing further.

6            THE COURT:  Anything further?

7            MR. CHAO:  Nothing further, Your Honor.

8            THE COURT:  All right.  I'll take the matter

9    under advisement.  All right, defendant is remanded to the

10   custody of the United States Marshals.

11   (3:10:38 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

1          CERTIFICATION

2      I, Maryann V. Young, court approved transcriber,

3  certify that the foregoing is a correct transcript from the

4  official digital sound recording of the proceedings in the

5  above-entitled matter.

6

7  /s/ Maryann V. Young            July 24, 2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25