UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                    ) | Crim. No. 13-CR-10149-FDS |
| ) | |
| EDWARD J. MACKENZIE, JR.,   ) | |
| ) | |
| Defendant.              ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR AN UPWARD DEPARTURE

The United States, by and through the undersigned Assistant U.S. Attorneys, hereby submits its sentencing memorandum and motion for an upward departure pursuant to USSG §§4A1.3 and 5K2.0. After far too many years of eluding justice and preying on society's most vulnerable members, the time has come for Edward MacKenzie to be held accountable. Accordingly, for the reasons set forth below, the government recommends a sentence of 144 months' imprisonment, the minimum sentence necessary to satisfy 18 U.S.C. §3553.

I.   Factual Background

The Indictment in this case was returned on May 21, 2013. It is based upon almost ten years of criminal conduct by self-proclaimed former gangster Edward J. MacKenzie, Jr. in connection with his involvement at the Boston Society of New Jerusalem Church on Beacon Hill (hereinafter, "the Church"). *See* ECF Dkt. No. 5 at 1-9. MacKenzie has a lengthy criminal history which he recounts in detail in his autobiography, Edward J. MacKenzie Jr., *Street Soldier: My Life as an Enforcer for Whitey Bulger and the Boston Irish Mob* (2003) (hereinafter, "*Street Soldier*"). Relevant portions of *Street Soldier* are attached hereto as Exhibit A.

In sum and substance, MacKenzie took over the Church starting in 2002 by taking advantage of an unengaged and elderly congregation, voting himself and his allies into positions

of power within the Church, and consolidating and fortifying his power by, among other things, changing the Church's by-laws for his own benefit, having the Church secede from the General Convention and other parent organizations of the Swedenborgian Church, and creating for himself the salaried position of "Director of Operations" for the Church – a position that MacKenzie held from 2003 until 2013 (at which time his salary and compensation was approximately $200,000 per year). *See* ECF Dkt. No. 5 at 7-9. Once in power, MacKenzie systematically looted the Church of its considerable financial assets through a combination of fraud, deceit, extortion, theft, bribery, and money laundering.

MacKenzie's crimes ran the gamut from "investing" $200,000 of the Church's money into a worthless Florida company in return for an $80,000 kickback to MacKenzie and a co-conspirator, to stealing over $168,000 in checks payable to the Church by creating sham bank accounts, to demanding kickbacks of approximately 20% from every vendor who did work at the Church, a cost that was ultimately borne by the Church. *See id.* at 10-30. While the loss amount calculated by Probation for the racketeering frauds to which MacKenzie pled guilty was approximately $539,599, MacKenzie's 10-year reign cost the Church – and the needy who relied on its charity and good deeds – millions of dollars.[1]

Moreover, in addition to the above-described criminal acts, MacKenzie's depraved personal behavior also cost the Church money. For example, MacKenzie arranged for the Church to pay $28,000 for drug rehabilitation for a woman referred to in the Indictment as "Jane Doe." *See* U.S. Probation Presentence Report (hereinafter, "PSR") at ¶ 189.[2] Jane Doe met

---

[1]   This figure was obtained by adding, among other things, the fraud amount found by Probation to MacKenzie's salary over 10 years, to the salaries and compensation of unqualified co-conspirators MacKenzie brought into the Church.

[2]   MacKenzie did not object to paragraph 189 of the PSR.

MacKenzie when she was approximately 15 or 16 years old (and MacKenzie was in his mid-40's) at an Al Anon meeting. After the meeting, MacKenzie asked her on a date to Applebee's, and the two soon became romantically involved. According to Jane Doe, after she became involved with MacKenzie, a relationship that lasted approximately four years, MacKenzie began to regularly provide her with OxyContin. As a result, Jane Doe became addicted. According to Jane Doe, when her father found out that she was addicted, her father told MacKenzie that, in sum and substance, because MacKenzie was responsible for getting Jane Doe addicted to OxyContin, MacKenzie was responsible for doing something to remedy the situation. MacKenzie subsequently arranged for the Church to pay $28,000 for Jane Doe to attend a four-month in-patient program at NarcAnon in Battle Creek, Michigan.

MacKenzie has been in custody since May 2013. During that time, he has:

i. encouraged others to lie to facilitate his pre-trial release, PSR at ¶¶ 80-82;

ii. used his daughter to attempt to obtain $5,000 from a co-conspirator in return for MacKenzie agreeing to "protect" him by not providing information against him in this case, *id.* at ¶¶ 110-113;

iii. encouraged his daughter to lie to Quincy District Court on his behalf, *id.* at ¶¶ 114-115;

iv. orchestrated an insurance fraud against Commerce, *id.* at ¶¶ 116-118;

v. attempted a fraud on this Court by directing multiple individuals to lie in their sentencing letters to this Court, including one female individual whom MacKenzie instructed not to mention in a letter to this Court that she started dating MacKenzie when she was 14 years old because, "the judge might not understand, even though [she] was old enough," *id.* at ¶¶ 83-86;

vi. attempted to arrange for one of his daughters to have a sexual relationship with a "nasty" inmate whom MacKenzie met in jail in exchange for money, *id.* at ¶ 190; and

vii. encouraged his daughter to have sexual relations with his girlfriend while MacKenzie was in jail so that his girlfriend did not sleep with other men, *id.* at ¶ 191.

On October 21, 2014, MacKenzie pled guilty to 13 of the 14 counts in the Indictment. *See* ECF Dkt. Nos. 95, 97.

II. <u>Advisory Sentencing Guidelines</u>

The government has no objections to the PSR and believes that the U.S. Probation Office has accurately calculated defendant's advisory guideline sentencing range of 97 – 121 months, as set forth below, based on the determinative calculation related to the racketeering fraud conduct. *See* PSR at ¶¶ 96-108.

a. **Base Offense Level:  7** [USSG §2B1.1(a)(1)]

b. **Enhancement for Loss Amount:  +14** [USSG §2B1.1(b)(1)(H); Loss of $539,599.74].[3]

c. **Enhancement for Sophisticated Means:  +2** [USSG §2B1.1(b)(10)(C); sophisticated means includes, but not limited to, taking steps and recruiting others to gain control of the Church; amending the Church's by-laws; establishing fraudulent bank accounts; and setting up a fraudulent trust through which fraud proceeds were laundered].

d. **Enhancement for Misrepresenting Acting For Church:  +2** [USSG §2B1.1(b)(9)(A)].

e. **Enhancement for Abuse of Position of Trust:  +2** [USSG §3B1.3; defendant was the Director of Operations at the Church].

f. **Enhancement for Aggravating Role:  +4** [USSG §3B1.1(a); defendant was an organizer or leader of criminal activity that involved 5 or more participants or was otherwise extensive].

---

[3]  The court must find the facts necessary to impose the enhancements set forth herein only by a preponderance of the evidence. *United States v. Dyer*, 589 F.3d 520, 524 (1st Cir. 2009) ("[T]he government must prove facts essential to sentencing enhancements by a preponderance of the evidence."); *see also United States v. Guzman*, 603 F.3d 99, 111 (1st Cir. 2010)("We reject Guzman's contention that the district court's factfinding to determine 2A1.1 to be the proper guideline violated the rule of *Apprendi v. New Jersey*.  'A sentencing court may make factual findings that result in an increase to a defendant's sentence as long as the sentence imposed is within the default statutory maximum.'" (quoting *United States v. Vasco*, 564 F.3d 12, 23 (1st Cir. 2009)) (citation omitted)).

4

    g.  **Adjusted Offense Level (Subtotal):**    **31**

    h.  **Acceptance of Responsibility:**    **-3** [USSG §3E1.1(a) and (b); defendant has demonstrated acceptance of responsibility for the offense and permitted the government to avoid preparation for trial.]

    i.  **Total Offense Level:**    **28**

    j.  **Criminal History Category III**; PSR at ¶¶ 119-130 (reflecting defendant's 6 criminal history points).

    k.  **GSR: 97-121 months**

III.  <u>MacKenzie's Criminal History</u>

The government agrees with Probation's criminal history calculation of six criminal history points; however, pursuant to USSG §4A1.3, as set forth in more detail below, the government believes that an upward departure is warranted here because MacKenzie's criminal history, which includes, among other things, a prior federal conviction in a significant narcotics case, *see* PSR at ¶ 124, understates the seriousness of his past criminal conduct and the likelihood that he will commit future crimes.

In *Street Soldier*, MacKenzie describes a brutal assault he committed:

> Once my victim was sprawled across the sidewalk, out cold, I'd go over his body with as much precision as a surgeon in the operating room. First, I'd probe with my feet, kicking each rib, feeling a high every time I heard one snap beneath my sneaker. Then, with one or two swift heel kicks, I'd attack the leg bones. Then I'd lift up the arms, one at a time, and *smash,* there went the ribs underneath, broken as easily as sticks underfoot. I worked methodically until the body had been pummeled to my satisfaction. Sometimes I even used my teeth, biting off an ear and spitting it back at the body: a farewell present for my victim when he opened his bloodied, swollen eyes. Once, I went for a finger instead and actually swallowed it. Made me a little sick, but nowhere as pained as the poor bastard that had to go through the rest of his life with nine fingers.

Exhibit A at 67.[4]

In 1995, MacKenzie was charged in South Boston District Court with assault with intent to maim.  See PSR at ¶ 158.  According to the case file, attached as Exhibit B, MacKenzie approached the sleeping victim in his car, poured scalding hot coffee on the victim's face, twice punched the victim in his face with a fist, and threatened to kill him.  The victim was transported to Massachusetts General Hospital for treatment for facial burns.  See Exhibit B at 6.  MacKenzie also described this incident himself in *Street Soldier* as follows:

> …I headed over to Dunkin' Donuts and bought a cup of coffee for $1.24. Medium, black, scalding hot … Steve was still in his car, sleeping like a baby.  The window was down and he had his head against the door, hands under his cheeks.  I poured the hot coffee down the side of his face, making sure to get some on his eyeballs.  He jerked awake, like he was on fire, and I leaned in, pulling him close to my face.  'If you ever touch or disrespect the mother of my kids again;' I said, real clearly, 'I will fucking burn you alive.  Remember, you motherfucker, the next time it will be gasoline.'  I swear if I'd had enough money to buy the gasoline that day that's what I would have done.  I would have soaked him down and stood there with a lighter and let him know exactly how vulnerable he was.  But I'd only had $1.30, so the coffee had to do.
>
> I was eventually charged with mayhem, assault and battery, and attempted murder.  So I sent a very loud message through some friends.  They told Steve that they knew where his parents lived and that he was making a big mistake.  Because any time they saw him, they'd hit him with a baseball bat.  He dropped the charges, and everything was dismissed.

See Exhibit A at 210-211.  MacKenzie received no criminal history points for this conduct.  See PSR at ¶ 158.

In October 2001, MacKenzie was charged in Suffolk Superior Court with five counts of larceny.  See PSR at ¶ 127. In September 2001, the 73 year-old female victim, a wealthy native Texan named Elisabeth von Bober, reported that she had paid MacKenzie, who informed her that

---

[4]   MacKenzie also recounts in *Street Soldier* a series of violent assaults he initiated against unsuspecting gay men, in what he referred to as "high-octane gay bashing."  See Exhibit A at 72-73.

he was a member of U.S. special forces, $350,000 in installments to locate her missing son. *Id*.; *see also* Kevin Cullen, Con Man Pleads Guilty in Swindle, *Boston Globe*, September 30, 2004, attached as Exhibit C. The victim also discovered during the investigation that her diamond ring, valued at $220,000, was missing. *Id*. The victim informed MacKenzie, who told her that he would assemble his team and search for the ring. *Id*. MacKenzie returned and provided the victim with what he claimed was her ring, but which was, in fact, a fake. *Id.*

According to a couple who had attended a cookout to which MacKenzie brought von Bober, when von Bober was out of earshot, MacKenzie confided to the couple that, "he knew she was loaded and that he was going to roll her for everything she was worth." Exhibit C at 1. Outside of court after his guilty plea, MacKenzie said, "With my record, who am I to roll the dice with a jury while she plays the black widow?" and "Would we be here if the shoe was on the other foot? …[i]f I was a young broad and she was an old man? I don't think so." *Id.* at 2. MacKenzie received three years' probation for the von Bober larceny and was ordered to pay $82,800 in restitution; he received one criminal history point for this case in the PSR. *See* PSR at ¶ 127.

In May 2003, MacKenzie was charged with witness intimidation and threatening to commit murder in Boston Municipal Court. *See* PSR at ¶ 159. According to the case file, attached as Exhibit D, the victim, one of MacKenzie's ex-wives who was involved in a workman's compensation case also involving MacKenzie, received a call from MacKenzie in which he stated that he was calling from the Suffolk County Courthouse. *See* Exhibit D at 8. According to the victim:

> [MacKenzie] was very upset in the victims roll [sic] in his workmen's compensation case. [MacKenzie] stated to victim that if she ever testified against him he would have her 'legs chained to a cinder block and have

> her thrown over a bridge.' [MacKenzie] also swore on his kids life that he would kill her if she ever testified against him.

*Id.* at 8-9. This case was eventually dismissed and MacKenzie received no criminal history points. *See* Exhibit D at 6; PSR at ¶ 159.

IV. Applicable Legal Standards

The Supreme Court has consistently noted that, when fashioning a sentence, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446 (1972); *Roberts v. United States*, 445 U.S. 552, 556 (1980); *see also Williams v. New York*, 337 U.S. 241, 246 (1949) (courts have traditionally "exercise[d] a wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law"). The Supreme Court further stated that the broad scope of the inquiry at sentencing is necessary because it is "[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence [for the sentencing judge to possess] the fullest information possible concerning the defendant's life and characteristics." *Williams*, 337 U.S. at 247.

Congress has provided that "[n]o limitation shall be placed on the information concerning the ... conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. As the Second Circuit has stated:

> [I]t is the district court's particular trust to ensure the 'uniform and constant' principle of the federal sentencing tradition, specifically, that 'every convicted person [be considered] as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'

*United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) (citation omitted).

USSG §4A1.3(a)(1) provides for an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." §4A1.3 lists the type of information that may form the basis for this departure including, among others, "[p]rior similar adult criminal conduct not resulting in a criminal conviction." USSG §4A1.3(a)(2)(E).

In essence, §4A1.3 allows a sentencing judge to move horizontally across criminal history categories if the guidelines fail to account for the gravity of his past conduct. *See United States v. Chapman*, 241 F.3d 57, 63 (1st Cir. 2001) ("In most cases, this means that the court should apply the sentencing guideline range that would result from the next higher criminal history category, or from whichever category the defendant best fits after considering the seriousness of his cumulative offenses."); *see also United States v. Flores-Machicote*, 706 F.3d 16, 21 (1st Cir. 2013) (describing a defendant's "history and characteristics" under 18 U.S.C. §3553 and citing §4A1.3 to consider "A record of past arrests or dismissed charges may indicate a pattern of unlawful behavior even in the absence of any convictions. . . . Logic dictates that a sentencing court may similarly consider whether, in a series of past convictions, the punishment appears to fit the crime. If the court concludes that an asymmetry exists which results in a substantial underestimation of the defendant's criminal history, it may vary the sentence upward to reflect past leniency.") (citations and quotation marks omitted).

USSG §5K2.0 "allows for upward departures if the court finds 'an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration' by the Guidelines and usually involve[s] the offense of conviction, rather than past criminal conduct." *United States v. Marsh*, 561 F.3d 81, 84 (1st Cir. 2009). Focusing on the "unusual *attributes of the*

*offense of conviction* . . . Section 5K2.0 departures are 'unguided,' and functionally 'vertical,' meaning that the sentencing court need not restrict itself to considering successively higher [criminal history category] ranges along the 'horizontal' axis in the sentencing table, but may select whatever sentence appropriately reflects the 'unusual' circumstances in the case." *United States v. Hardy*, 99 F.3d 1242, 1248 (1st Cir. 1996).

In deciding to make an upward departure, the sentencing court may combine these sections to rely on §4A1.3 and §5K2.0 together. *See United States v. Aymelek*, 926 F.2d 64, 69-70 (1st Cir. 1991) ("On most occasions, this is an 'either/or' proposition; the court will decide to depart pursuant either to section 5K2.0 or to section 4A1.3. In an appropriate case, however, a court may amalgamate both grounds into a single departure decision."); *see also Hardy*, 99 F.3d at 1252 ("In determining such 'mixed' departures, no useful purpose is served by insisting that the sentencing court adhere to all section 4A1.3 formalities, only to countenance its 'unguided' discretion to make an 'appropriate' non-horizontal departure under section 5K2.0.").

As this Court held in *United States v. Marsh*, 486 F. Supp. 2d 150, 157 (D. Mass. 2007), a court may depart under §5K2.0(a)(1)(A) if there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing guidelines. In *Marsh*, this Court then found that an upward departure was "warranted under §5K2.0 because the guidelines do not contemplate the peculiar constellation of events presented by this case." *Id.* at 158. This Court also noted that information contained in police reports may be considered for sentencing purposes if it is reliable. *Id.* at 156.

V. <u>Pursuant to USSG §§4A1.3 and 5K2.0, This Court Should Upwardly Depart When It Sentences MacKenzie</u>

As the facts of this case, the PSR, and *Street Soldier* demonstrate, MacKenzie has engaged in a lifetime of crime – the majority of which has gone unpunished. To that end, this

case presents the Court with a defendant whose criminal history category of III does not adequately represent the seriousness of his criminal past and the likelihood that he will commit future crimes. *See* PSR at ¶ 130.

For example, MacKenzie received zero criminal history points for cases involving some of his most cruel and violent acts. Specifically, MacKenzie received no criminal history points for the 1995 assault with intent to maim case in which MacKenzie, at 37 years of age, poured scalding hot coffee on the face of an unarmed, and sleeping individual, who ended up being hospitalized at Massachusetts General Hospital for facial burns. *See* PSR at ¶ 158; Exhibit B. In addition, MacKenzie received zero criminal history points for the 2003 witness intimidation and threatening to commit murder case in which, at 44 years of age, MacKenzie threatened to have his ex-wife's "legs chained to a cinder block and [] thrown over a bridge." *See* PSR at ¶ 159; Exhibit D at 8. It should also be noted that in both of these cases, the key victim-witness never made it to the witness stand against MacKenzie. If they had, however, and MacKenzie were found guilty and sentenced accordingly for those crimes, his criminal history would be category V.[5]

If the Court decides not to upwardly depart pursuant to §4A1.3, the government submits that this case (and this defendant) present a "peculiar constellation of events" such that a

---

[5] The 1995 case involved a charge of assault with intent to maim, in violation of M.G.L. ch. 265, § 15, *see* PSR at ¶ 158; Exhibit B. M.G.L. ch. 265, § 15a is a crime punishable for up to ten years in state prison or jail for not more than two and one half years. The 2003 case involved a charge of witness intimidation, in violation of M.G.L. ch. 268, § 13B, which is punishable by imprisonment of not more than ten years. Had MacKenzie been convicted of these crimes and sentenced to a term of imprisonment in excess of only 60 days, these crimes would have resulted in an increase of 4 points to MacKenzie's criminal history (total of 10), putting him within a Criminal History Category V. *See generally* USSG §4A1.1(b).

sentence cannot be neatly and clearly defined by the sentencing guidelines. *See* USSG §5K2.0; *see also Marsh*, 486 F. Supp. 2d at 158.

As noted in the PSR, in addition to the instant crimes and his criminal past, MacKenzie has engaged in criminal and otherwise depraved conduct since his incarceration on this case in May 2013. And while the sentencing guidelines do account for, among other factors, the amount of MacKenzie's fraud, the damages to the Church, and the defendant's role in the offense, nowhere do they provide for an enhancement where, as here, a father compels his own children to, among other things, commit crimes for his benefit, lie for his benefit, and engage in sexual acts for his benefit. *See* PSR at ¶¶ 110-112, 114-115, 190-191.

The proof before this Court with respect to the 1995 and 2003 cases, and MacKenzie's ongoing criminal activity since his incarceration on this case is reliable. First, and critically, with respect to the 1995 and 2003 cases, and the lawfully obtained jail correspondence included in the PSR, MacKenzie did not object to the underlying facts.[6] That alone is enough for this Court to find the underlying facts to be true, accurate, and reliable. *See United States v. Rosales*, 19 F.3d 763, 770 (1st Cir. 1994) ("Because no objection was lodged with respect to the PSR's contents, these facts could be accepted as true and accurate.") (internal citations omitted); *see also Marsh*, 486 F. Supp. 2d at 156 ("disregarding reliable information from police reports would run directly contrary to both 18 U.S.C. § 3661 and its guideline counterpart, § 1B1.4;" "[i]t would be anomalous, indeed, if during the sentencing process the Court could consider self-serving and often unverifiable information from a defendant (for example, statements concerning childhood

---

[6] MacKenzie's only objection to the jail calls contained in paragraphs 109-118 is that they were partial contents of conversations that "are taken out of context and could be misleading." *See* PSR at p. 47, objection #3. This is not true, as the government has listened to the entire conversations and believes the calls are fairly synopsized. In any event, MacKenzie does not deny the substance of the conversations and if the Court wishes, the government can provide the calls to the Court in their entirety or publish them at the sentencing hearing.

abuse or trauma), but not an official record from a law enforcement agency concerning conduct that led directly to a criminal charge."). Moreover, with respect to the 1995 case, MacKenzie admitted to committing that crime in *Street Soldier*. See Exhibit A at 210-211.

Should the Court exercise its considerable discretion and upwardly depart in accordance with §4A1.3, §5K2.0, or both, the government respectfully requests that the Court, as it did in *Marsh*, also find that it would have given MacKenzie the same sentence under §3553 even if did not upwardly depart. *See Marsh,* 486 F. Supp. 2d at 159, n.11. Finally, as discussed in more detail below, even if this Court chooses not to upwardly depart, the government believes that the §3553(a) analysis compels the conclusion that a sentence of 144 months is the minimum sentence sufficient, but not greater than necessary, to comply with the purposes set forth in §3553(b)(2).

VI. Sentence Recommendation and 18 U.S.C. §3553 Analysis

The government respectfully requests that the Court impose the following sentence on MacKenzie on March 6, 2015: incarceration for a period of 144 months, to be followed by 36 months of supervised release, restitution of $754,569.74, no fine, and a $1,300 special assessment. As set forth more fully below, a sentence of 144 months' incarceration is the minimum sentence necessary to satisfy 18 U.S.C. § 3553.

A. 18 U.S.C. §3553(a)(1) - Nature and Circumstances of Offense and Defendant's History

The foundation of the Boston Society of the New Jerusalem Church can be traced back to 1784; the Church itself was chartered in 1823 as the first Swedenborgian church in Massachusetts. The Church has long been deeply committed to public service, helping the homeless, and "extending [] love and service into the world." *See* http://churchonthehillboston.org/about/what-we-believe/. Preying on that tradition, MacKenzie

13

devised a complex scheme to take over the Church and loot it of its considerable wealth. In so doing, MacKenzie deprived countless individuals in need of charity.

That MacKenzie, 56 years of age, stole the amount of money that he did from a church is bad enough; that he did so by holding himself out as a redeemed mob enforcer, while simultaneously threatening to go back to his old ways if anyone crossed him, is abhorrent. *See, e.g.*, PSR at ¶ 49. Moreover, MacKenzie's conduct in this case is no aberration, but rather part of a lifelong pattern of victimizing the vulnerable through manipulation and brute force.

In addition to MacKenzie's prior criminal activity, which spans essentially his entire adult lifetime, since his incarceration on this case in May 2013, MacKenzie has, as set forth herein, continued to engage in criminal and otherwise depraved behavior. *See* PSR at ¶¶ 190-191.[7] This behavior demonstrates that MacKenzie is unrepentant for what he has done, and is extremely likely to recidivate.

### B. 18 U.S.C. §3553(a)(2)(A), (B), and (C) - Need to Promote Respect For Rule of Law, Afford Adequate Deterrence, and Protect Public From Defendant's Future Crimes

The only way to protect the public from Edward MacKenzie is to remove him from the public for as long as possible. Further, as defendant has been breaking the law and beating the system for most of his life, the best way ─ in fact, the only way ─ to now promote respect for the rule of law, and provide a measure of justice for all of the innocent victims MacKenzie has exploited over the years, is to sentence him to a significant period of incarceration. Finally, in accordance with 18 U.S.C. §3553(a)(2)(B), this Court should send a strong message not only to the defendant, but to the general public and the community at large, that stealing from elderly and trusting Church members, bullying and intimidating others with credible threats of violence,

---

[7] According to the PSR, defendant is the father of seven children by four different women. *See* PSR at ¶¶ 169-180.

manipulating and victimizing the defenseless, including Jane Doe, and using your own daughters in the manner MacKenzie has are totally unacceptable in a free society, and will be met with the law's most severe consequences.  Given how long MacKenzie has evaded justice, that message is all the more important here.

      Respectfully submitted,

      CARMEN M. ORTIZ
      United States Attorney

By:   */s/ Zachary R. Hafer*
      ZACHARY R. HAFER
      DUSTIN CHAO
      Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

By:   */s/ Zachary R. Hafer*
      ZACHARY R. HAFER
      Assistant U.S. Attorney

Date: February 27, 2015