IN CLERKS OFFICE
FILED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

2019 SEP -9  PM 2: 28

U.S. DISTRICT COURT
DISTRICT OF MASS.

EDWARD MACKENZIE )
    Petitioner, )
       )
v. )    CRIMINAL NO. 13-cr-10149
       )
UNITED STATES OF AMERICA )
    Respondent. )

### MOTION TO REDUCE PETITIONER'S SENTENCE
### PURSUANT TO TITLE 18 U.S.C. §3582(c)

NOW COMES Edward Mackenzie (hereinafter "Petitioner"), to move this Honorable

Court to revisit, review, and reconsider Petitioner's sentence in light of Sentencing Guidelines

Amendment 794 (SGA 794), which the First Circuit recently determined to be retroactive to all

defendants as a "clarifying" amendment to the Sentencing Guidelines. Petitioner respectfully

asserts to the Court that everything contained in this Motion is the absolute truth, and that

Petitioner's sentence was a miscarriage of justice and a clear violation of Petitioner's rights to Due

Process as guaranteed by the Constitution.

## PRELIMINARY STATEMENT

The Supreme Court has made two things absolutely clear when it comes to sentencing a defendant. First, "…what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation." *See United States v. Gonzalez-Castillo,* 562 F.3d 80, 84 (1st Cir. 2009) *citing Townsend v. Burke,* 334 U.S. 736, 740-41 (1948). *See, also, United States v. Delacruz,* 862 F.3d 163, 175 (2d Cir. 2017).

Second, each and every defendant is to be sentenced as he stands now before the court on the day of sentencing. Whatever or whoever the defendant was 30 years ago or even 5 years ago should not be discussed by the court, much less be the basis for sentencing. Respectfully, the Court did not do this. *See United States v. Lopez-Pastrana,* 889 F.3d 13 (1st Cir. 2018), *citing Pepper v. United States,* 562 U.S. 476, 492 (2011), *quoting United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000) ("a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing."). Clearly, neither of these two absolute rules of sentencing happened in Petitioner's case. Instead, he was sentenced based on a mythical "life of crime" in his book discussing largely fictional accounts of interactions with the infamous Whitey Bulger from over 30 years ago. The government in this case slandered a genuinely reformed and charitable man with fabricated lies and innuendo as if he were a notorious racketeer and mobster, while wholly ignoring the ultimate tax-fraud that continues to this very day as the Boston Society of the New Jerusalem Church, commonly known as the "Church on the Hill" (hereinafter "the Church").

Rather than be called the "Church on the Hill", it should have been called the "Scam on the Hill", as the massive tax fraud was formed and created when the Petitioner was only two years

2

old. The only other person to receive any prison time in this massive tax fraud was Tom Kennedy, who only received a year and a day and who was President and the head of the Board of the Church until he stole from his fellow Board Members. Yet, Petitioner was the only person doing charitable works throughout the Church and was kept on for five years after Kennedy was fired. And, according to the government's rendition of the alleged facts, Petitioner's only job was to funnel tax-free money to provide them with luxurious vacation homes and full tax-free scholarships and grants to their children. The Church has been one massive tax fraud for almost 60 years. This Court should have the government ask a very simple question to the Elders and Board Members of the Church: "Now that Petitioner has been locked up for almost seven years, and you received $3 million a year from the Bostonview Apartments, how much of that money has gone to the poor and needy, and how much has gone to your own pockets in violation of Treasury Regulations against private inurement?"

If the government truly cared about justice and not headlines, they would immediately seek Petitioner's release and begin a tax fraud investigation of the "Scam on the Hill"; erroneously referred to as the Church. The Church has taken in over $20 million since Petitioner was incarcerated, but the Church's Board has cancelled or disbanded each and every charitable program Petitioner started or ran including funding for the Homeless Vets, battered wives, orphaned children, and meals for the Homeless. Even a cursory review of the Church's current operations and finances would show little or no money going to the poor, but millions to line the pockets of the Elders and current Board Members of the Church. If the Church was the criminal enterprise for RICO purposes, then the Petitioner deserves a Four-Level Mitigating Role Reduction pursuant to SGA 794, and the Court should at the same time reconsider its Four-Level enhancement for a leadership role because at no time did Petitioner "control" anyone at the Church or anyone on the

Board, much less five "criminally culpable participants" as required by the Sentencing Guidelines. Based on those clear and incontrovertible facts, Petitioner should be resentenced to time served and have this Court order his immediate release from prison.

## I.    LEGAL STANDARD

Section 3582(c)(2) establishes an exception to the general rule of finality in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered and made retroactive by the Sentencing Commission pursuant to §994(u) or deemed retroactive by the courts as a clarifying amendment and therefore retroactive for all defendants. *See United States v. Quintero-Leyva,* 823 F.3d 519, 523 (9th Cir. 2016). In such cases, Congress has authorized courts to reduce the term of imprisonment, after considering the factors set forth in §3553(a). Therefore, the Supreme Court has stated that *"§3582(c) represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines." See Dillon v. United States*, 560 U.S. 817, 819 (2010) (emphasis added).

In *United States v. Aybar-Ulloa*, 913 F.3d 47 (1st Cir. 2019), the First Circuit cited *United States v. Sarmiento-Palacios,* 885 F.3d 1 (1st Cir. 2018) for the determination that Amendment 794 is retroactive for all defendants as a "clarifying" amendment, and is therefore to be used in the reduction of a sentence application under 18 U.S.C. §3582(c). The Sentencing Commission enacted Amendment 794, which altered §3B1.2's commentary. *See* U.S.S.G. supp. to App. C, amend. 794, at 116-18 (2015) [hereinafter Amendment 794]. The amendment added language to the commentary notes that, among other things, explained that the mitigating role reduction should apply to defendants who are "substantially less culpable than the average participant in the criminal

4

activity" and listed five "non-exhaustive...factors" that courts "should consider" when determining whether a defendant qualifies for the reduction.

Amendment 794 addressed a circuit split over §3B1.2's pre-amendment guideline commentary, which allowed a sentencing court to apply the mitigating-role reduction when the defendant was "substantially less culpable than the average participant." U.S.S.G. §3B1.2, cmt. n.3(A) (2014). Some circuits evaluated the "average participant" by looking only at the other participants in the defendant's actual activity; other circuits, including the First Circuit, looked also to the "universe of persons participating in similar crimes" to define the average participant. Amendment 794 at 117. The amendment "generally adopt[ed]" the former approach by revising the application note to read: "substantially less culpable than the average participant in the criminal activity." *Id.* (emphasis added). Petitioner respectfully submits that Amendment 794 clarified the Sentencing Commission's original intent regarding §3B1.2 and therefore applies retroactively to his case and should result in his being resentenced to time served and released from prison.

The Supreme Court's recent decision in *Hughes v. United States,* 138 S.Ct. 1765 (2018) proves that §3582(c)(2) relief is available to all defendants, even those who pled guilty and were fortunate enough to have competent counsel negotiate a defendant-friendly Rule 11(c)(1)(C) plea agreement:

> A principal purpose of the Sentencing Guidelines is to promote "**uniformity in sentencing imposed by different federal courts for similar criminal conduct.**" *Molina–Martinez* at 1342. Yet in the aftermath of *Freeman,* a defendant's eligibility for a reduced sentence under §3582(c)(2) turns on the Circuit in which the case arises. Further, even within Circuits that follow the *Freeman* concurrence, unwarranted disparities have resulted. In some cases defendants have been held ineligible for relief even where the sentencing hearing makes it crystal clear that the Government and the defendant agreed to a Guidelines sentence and the district court imposed one... This interpretation furthers §3582(c)(2)'s purpose, as well as the broader purposes of the Sentencing Reform Act. "The Act aims to create a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Freeman* at 533. "**Section 3582(c)(2) contributes to that goal by ensuring that district courts may adjust**

5

**sentences imposed pursuant to a range that the Commission concludes [is] too severe, out of step with the seriousness of the crime and the sentencing ranges of analogous offenses, and inconsistent with the Act's purposes."** *Id.* **And there is no reason a defendant's eligibility for relief should turn on the form of his plea agreement**." *Hughes* at 1777 (emphasis added).

*Hughes* is based largely on Justice Sotomayor's persuasive Concurrence in *Freeman v. United States*, 564 U.S. 522 (2011):

> "I agree with the plurality that petitioner William Freeman is eligible for sentence reduction under 18 U.S.C. §3582(c)(2), but I differ as to the reason why. In my view, the term of imprisonment imposed by a district court pursuant to an agreement authorized by Fed.R.Crim.P. 11(c)(1)(C) ((C) agreement) is "based on" the agreement itself, not on the judge's calculation of the Sentencing Guidelines. However, I believe that if a (C) agreement expressly uses a Guidelines sentencing range applicable to the charged offense to establish the term of imprisonment, and that range is subsequently lowered by the United States Sentencing Commission, the term of imprisonment is "based on" the range employed and the defendant is eligible for sentence reduction under §3582(c)(2). To ask whether a particular term of imprisonment is "based on" a Guidelines sentencing range is to ask whether that range serves as the basis or foundation for the term of imprisonment. No term of imprisonment—whether derived from a (C) agreement or otherwise—has legal effect until the court enters judgment imposing it. **As a result, in applying §3582(c)(2) a court must discern the foundation for the term of imprisonment imposed by the sentencing judge.** As the plurality explains, in the normal course the district judge's calculation of the Guidelines range applicable to the charged offenses will serve as the basis for the term of imprisonment imposed. *See Gall v. United States,* 552 U.S. 38, 49 (2007)." *Freeman* at 534-35 (emphasis added).

Therefore, based on the fact that Petitioner was erroneously sentenced based on enhancements that were clearly inappropriate and not proven by any standard, this Court should use §3582(c) as the "act of lenity" that Congress intended in order to resentence Petitioner correctly based on SGA 794, and as he stands today; not the myth of who he was 30 years ago.

## II. SENTENCING GUIDELINE AMENDMENT 794 MITIGATING ROLE ANALYSIS FOR PETITIONER

Petitioner respectfully submits that he is entitled to a Four-Level Reduction pursuant to Sentencing Guidelines Amendment 794 for having a minor role in whatever corruption or fraud that happened at the Church; which he adamantly denies being a party to. Even assuming *arguendo* that there was a "conspiracy" surrounding the Boston Society of New Jerusalem Church, which Petitioner denies he participated in or controlled, the Court is still obligated to determine what role, if any, Petitioner played in the alleged conspiracy surrounding the Church, and if that role was a "minimal" one, he is entitled to a Four-Level Reduction under the Sentencing Guidelines. For example, as the Second Circuit described Amendment 794 in *United States v. Soborski,* 708 Fed.Appx 6 (2d Cir. 2017):

Under §3B1.2 of the Guidelines, a defendant's offense level is reduced by two levels if he was a minor participant in any criminal activity, four levels if a minimal participant, and three levels if falling somewhere between those two categories.

The Second Circuit went on to describe Amendment 794's impact on sentencing for "participants" in a "criminal activity" or in a many-participant conspiracy as is alleged here:

Amendment 794, which became effective in November 2015, less than a year before Soborski's sentencing, modified significantly-especially within this Circuit-the factors that a district court should consider in deciding whether to apply the reduction. It added to the Guidelines commentary the following non-exhaustive list of factors that the district court "should consider" among the "totality of the circumstances":

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)     the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)      the degree to which the defendant stood to benefit from the criminal activity.

Moreover, Amendment 794 also clarified that a reduction for a minor role is not necessarily precluded by a defendant's performance of "an essential or indispensable role in the criminal activity," and that a defendant with an essential or indispensable role may still receive a mitigating role reduction if he or she was "substantially less culpable than the average participant in the criminal activity." Respectfully, Petitioner asserts that he never had a leadership role and was certainly not the leader of the pervasive fraud that continues to this very day at the Church while Petitioner has been locked up for six years. In fact, the massive tax fraud that the Church encompasses began almost 60 years ago when the Petitioner was just two years old and yet each and every truly charitable program started by the Petitioner has since been shut down by the Church, so there is virtually nothing that the Church does that is charitable, religious, or of benefit to the social welfare of the community. Examples of the charitable programs that the Church funded and supported while Petitioner was there included the following:

The New England Home for Little Wanderers
The Homeless Veterans Charity
The Homeless Womens Charity
St. Paul's Monday night Dinner for the Homeless, where Petitioner provided over 250 meals every Monday night for the homeless.
The Bridge Over Troubled Waters Charity, which was dedicated to serving homeless, runaway, and at-risk youth.

All of these truly charitable programs that Petitioner started or supported have since been disbanded, while the Board continues to siphon off tax-free dollars for their own families while seemingly forgetting any pretense of helping the less fortunate and the homeless. Of particular note, the Petitioner was a ward of the state, having been abandoned at age 5, and was himself

8

boarded at the Home for Little Wanderers. While printing all of the fake stories in Petitioner's book, Probation forgot to mention that as a young boy Petitioner was abandoned by his parents at age 5, sexually molested by a priest at age 7 and raped by a trusted teacher at age 9. Just like a young puppy raised by cruel people will become vicious over time, it is not surprising that Petitioner learned to defend himself on the street and in boxing clubs and gyms. While it is true he ran a bar that Bulger controlled over 30 years ago, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing", not what he was rumored to be 30 years ago. The Court respectfully did not do this. *See United States v. Lopez-Pastrana*, 889 F.3d 13 (1st Cir. 2018), *citing Pepper v. United States*, 562 U.S. 476, 492 (2011), *quoting United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000).

During Petitioner's tenure as Director of Operations, the Church clearly performed charitable services and gave charitable support to the community. After Petitioner's arrest, however, the unlawful private inurement of the Church has accelerated to a point where the Church squanders $3 million annually to benefit the families of the Board Members while giving nothing to the Poor and the Destitute as is required of all tax-exempt charities. Since Petitioner's incarceration, the Church has collected over $20 million tax-free while giving pennies to the Poor. Significantly, in the commentary for Amendment 794, the Sentencing Commission meaningfully changed the phrase "substantially less culpable than the average participant" to "substantially less culpable than the average participant in the criminal activity." *See* U.S.S.G. §3B1.2 cmt. n. 3(C). The Second Circuit described in *Soborski* why this addition would be crucial to this Court's determination of the appropriate sentence in Petitioner's case:

Explaining its reason for adding the words "in the criminal activity," the Commission described a circuit split over the meaning of "the average participant": some circuit courts interpreted it to mean the average among those "participat[ing] in the criminal activity at issue in the defendant's case," *id.*, while other circuits—including ours—looked to the

9

average participant among "the universe of persons participating in similar crimes," *id.* (citing *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)). The Commission stated that it added the words "in the criminal activity" because it favored the former interpretation, under which "the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand." We give the Commission's "interpretation of its own Guideline controlling weight unless it is plainly erroneous or inconsistent with the regulation or violates the Constitution or a federal statute." *United States v. Lacey*, 699 F.3d 710, 716 (2d Cir. 2012). *The Commission's clear directive is for courts to determine a defendant's relative culpability only by reference to co-participants in the case at hand, and we perceive no reason not to give its interpretation controlling weight. Soborski* at \*10-13.

In support of his request that he had, at most, a "minimal" role in the alleged Church RICO

conspiracy, Petitioner submits the following:

1. In May 2003, Tom Kennedy recruited Petitioner to the Boston Society of New Jerusalem Church, Inc. (hereinafter the "Church"). Tom Kennedy was the President and Chairman of the Board of Trustees of the Church, and there were seven board members in all who controlled each and every activity of the Church and shared in Petitioner's alleged illegal kickbacks.

2. In December 2003, Tom Kennedy and all of the board members unanimously voted to hire Petitioner as the Director of Operations; a paid employee of the Church, who reported to Kennedy and the Board.

3. Despite Petitioner's corporate title, he was not in control of anything, was subject to the whims of the Board, and was under the personal direction of Tom Kennedy who was really the one in control of the Church's fraudulent operations.

4. Tom Kennedy was also the President and Chairman of Bostonview Apartments, owned by the Church.

5. Each and every one of Petitioner's acts were known to, and approved by, the Board as "business as usual."

6. Bostonview Apartments was owned and controlled by the Church, which was merely a charitable non-profit "front" for a lucrative real estate business.

7. In 2009, Tom Kennedy was removed from all boards and as President of the Church for stealing from the Church, outright theft, and fraud. Petitioner was not fired because he had nothing to do with Tom Kennedy's theft and fraud, or the fake account at Sovereign Bank.

8. Robert Von Wolfgang was appointed by the Board to replace Tom Kennedy. At no time was Petitioner in control of the Church's operations, nor did Petitioner's family

benefit from any of the illicit scholarships, grants, or other non-charitable private inurement payments made to the Board Members, such as money for vacation homes on Cape Cod.

9. Petitioner stayed on as an employee, hired by the Board of Trustees of the Church, and working under their direct control. Any and all funds that Petitioner received as alleged "kickbacks" from contractors was not only done with the knowledge of the Board Members, that money was shared with each and every Board Member as a type of illicit profit-sharing plan to siphon funds from the fraudulent charity into the hands of Board Members on a tax-free basis. The Church is one big fraudulent tax shelter and Petitioner merely did the collecting of the kickbacks to share with the Board Members under the table. Unlike Kennedy, he was never accused of stealing from the Board Members or the Church.

10. Unlike the Church, which was clearly a fraudulent charity doing absolutely no charitable works, Petitioner was doing extensive charitable works for the Community.

11. For example, Petitioner was responsible for bringing many needy organizations to the Church, such as the Homeless Women's Club, Bridge Under Troubled Water, Rosie's Place, N.E. Veterans Club, and the N.E. House for Little Wanderers. He also organized trips every year to Six Flags, where over 250 inner city youths would gather and enjoy a day of unity and fellowship. Petitioner helped prepare Monday night dinners for the homeless at St. Paul's Cathedral, where over 200 homeless were served each week.

12. The Church rebuilt its old chapel in 1960 along with 142 apartments and 85 parking spaces in order to sustain itself. The Congregation consisted of only 20-30 members for years while tax-free as a fake charity. The apartments brought in $3 million a year in rent and parking; all non-taxable as an alleged "not-for-profit" institution.

13. All Board Members used Church proceeds to pay for their children of the Church to go to college (full scholarships), as well as homes, vacation homes in Cape Cod, and automobiles for the Trustees.

14. The very same conduct Tom Kennedy did and that Petitioner was accused of was common amongst all of the Board Members and Trustees.

15. To this day, the Church still pays for college tuition, rent, mortgages, high salaries for jobs not needed, and health insurance for employees who are getting paid for 40 hours a week but are only working 3-5 hours a week.

16. Even if one considers Petitioner's job as Director of Operations "essential" to the alleged criminal fraud, he is still entitled to a Four-Level mitigating role adjustment pursuant to SGA 794.

17. Moreover, as it is clear that Tom Kennedy began and controlled the illegal activities at the Church, there is no way that Petitioner should have received a Four-Level enhancement at sentencing for a leadership role, as no one reported to Petitioner, and he was not the "boss" of anyone; much less five criminally culpable individuals as required by the Sentencing Guidelines.

18. Because as a "clarifying" amendment SGA 794 is clearly retroactive, this Honorable Court should resentence Petitioner based on a Four-Level mitigating role adjustment to time served, because the mitigating role adjustment is directly contradictory to the enhancement that he received for being the leader of five criminally culpable people, none of whom are listed anywhere in the PSR and sentencing minutes as required by law.

19. The only person who could possibly be considered the "leader" of the fraudulent and illegal activities of the Church was Tom Kennedy, who received a sentence of only a year for running a blatantly fraudulent charity for the benefit of the seven members of the Board of Trustees.

20. It is indeed ironic that Tom Kennedy recruited and hired Petitioner, but after he was fired for stealing from the Board, those very same board members kept Petitioner on for seven more years. Tom Kennedy and the Board were all guilty of tax fraud, tax evasion, and using charitable money to line their own pockets tax-free while doing nothing to benefit the community. The Church was one massive tax fraud that Petitioner had absolutely nothing to do with, much less control over.

21. To the contrary, Petitioner's good works were recognized by the City of Boston, the Commonwealth of Massachusetts, and various government officials (see Exhibit One) for his charitable works with the following organizations:

    The New England Home for Little Wanderers
    The Homeless Veterans Charity
    The Homeless Womens Charity
    Dinners for the Homeless at St. Paul's
    The Bridge Over Troubled Waters Charity

22. Most of the people involved with the Church were not indicted or received probation. Tom Kennedy received a sentence of a year and a day, and Petitioner's 12 year sentence is ridiculous based on his alleged "notorious" past from 30 years ago with the infamous Whitey Bulger. Both the Court and the government believed a harsh sentence was necessary because of Petitioner's 30 year old relationship with Bulger as recited in his book that was published shortly before Tom Kennedy's departure for defrauding his own fraudulent empire. But, Kevin Weeks, who truly was Bulger's right-hand man, received only five years imprisonment despite being involved in dozens of killings at 799 East Third Street. See Boston Herald article from July 2019 attached as Exhibit Two.

23. Significantly, everyone at the Church knew about Petitioner's "checkered" past because he had a book signing at the Church. Tom Kennedy certainly knew about Petitioner's past, as well as his change of heart and redemption from teenage hoodlum to genuine pillar of the community; aiding homeless Vets, battered women, and the Poor. Had it not been for the Government's indictment, there is no doubt that Petitioner would still be working at the Church today and providing support for local charities, unlike what the Church has been doing without Petitioner.

24. The best evidence that Petitioner was not high up in the Bulger organization (or in the fraudulent Church for that matter), comes from an internet interview of Kevin Weeks in 2006, where people ask what Weeks thought of Petitioner's claims, and he commented that Petitioner was a nobody and not in Bulger's organization at all. See the interview of Kevin Weeks attached as Exhibit Three. No one disputes that Weeks was Bulger's right hand man and that he only received five years for helping to kill and/or bury dozens of people. It is ludicrous that Petitioner received 12 years for running a bar under Bulger's control 30 years ago, and for being the only truly charitable person involved with the Church. Even Phyllis Karas, the co-author of Petitioner's book and Kevin Weeks' book Brutal compared and contrasted Weeks and Petitioner in her 2018 interview attached as Exhibit Four. Ms. Karas describes Petitioner as a "likeable albeit not always truthful...low-level drug dealer", whereas as they travel around Boston together visiting the "burial sites" of a number of people that Weeks helped to kill and bury, she describes him as truly a brutal murderer who served only five years because he cooperated with the government. The contrast between the two men just could not be more stark, and the reason that Weeks gives her for wanting her to write his book is because of his hatred for Petitioner and the lies that Petitioner told about Weeks in his book. Therefore, the truth of the matter as revealed by Ms. Karas in her 2018 interview is that Petitioner had nothing to do with the Bulger gang, he loves to tell a good story, and he was truly doing charitable works at the Church while Weeks really was Bulger's right hand man and received half of Petitioner's sentence despite the fact that he killed at least 5-6 people.

Not only has the Government failed to prove that Petitioner was the "leader" of a five-or-more participants in a scheme to defraud (by a preponderance of the evidence), making him eligible for an enhancement under §3B1.1, the Government has totally failed to address Petitioner's entitlement to a Four-Level Reduction pursuant to having a minor role if there really were dozens of people involved in this alleged scheme as the Government suggests in the list of people to be searched in its Search Warrant Affidavit attached as Exhibit Five. This fact alone entitles Petitioner to be resentenced pursuant to SGA 794 and to be sent home immediately.

III.     **AN ANALYSIS OF THE SENTENCING GUIDELINES AMENDMENT 794 FACTORS PROVES THAT PETITIONER IS ENTITLED TO A FOUR LEVEL MITIGATING ROLE ADJUSTMENT REDUCTION**

It is beyond peradventure that Petitioner did not create, manage, control or even benefit

from the massive tax fraud known as the Church on the Hill.  Because of these incontrovertible

facts analyzed in the light of the SGA 794 factors, this Court should resentence Petitioner to time

served and order his immediate release from prison based on the following analysis of the SGA

794 factors:

**(i)     the degree to which the defendant understood the scope and structure of the criminal activity;**
At no time did Petitioner believe he was doing anything illegal because he was doing what he was told to do by the Church's Elders, the Board, and specifically the Church's President Tom Kennedy. Petitioner believed this was the way the Church had always converted the profits from the Bostonview Apartments to the pockets of the Church members on a tax-free basis.  If there was truly a criminal conspiracy here, then Petitioner was a very small cog in a 50 year old machine.

**(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;**
It is beyond cavil that the pervasive tax fraud and unlawful private inurement that started almost 60 years ago and continues unabated to this very day while Petitioner languishes in prison was directed by the Church Elders and the Board Members and continues to be directed by these same people, their descendants, and their family members. The truly charitable programs designed and operated by the Petitioner have all been suspended or disbanded.  The criminal enterprise known as the Church on the Hill was not planned or organized by Petitioner and continues to this day without him.

**(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;**
Once again it is incontrovertible that Petitioner was hired by, worked for and was directed by Tom Kennedy and the Board of the Church.  After Kennedy was fired by the Board for stealing from the Church in 2009, Petitioner continued to work under the Board's direction until the unlawful search and seizure of Petitioner's home and office (and his arrest) in 2013.  If the government's account of the facts is true, which is highly doubtful, and the criminal activity in the Church goes back to 2002, then Petitioner had no decision making authority in the criminal activity at all because he was hired by the Board in January of 2004 and was forced to leave when he was arrested in 2013.  Since that time, the Church has taken in over $20 million in revenue tax-free and has spent virtually nothing on the needs of the poor

and disadvantaged, yet continues to line the pockets of the families of the Church Elders and Board Members as it has done for almost 60 years; without any decision making authority by Petitioner.

**(iv)** **the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;**
In addition to being one of the few people involved with the Church that truly did charitable acts and supported other true charities, it is beyond dispute that each and every allegedly unlawful "kickback" that Petitioner received was religiously split with the seven Board Members and others within the Church. Far from being illegal or unauthorized, this was business as usual for the Church and Petitioner was merely the person facilitating the Church's illicit "profit-sharing" plan for the Board Members and Elders on a "tax-free" and unreported basis. In light of the Supreme Court's decision in *McDonnell v. United States,* 136 S.Ct. 2355 (2016), this Court needs to review its decision in this case, because Petitioner was merely doing what he was told by the Board under their express authority and with their knowledge, in delivering the private inurement perquisites the Board Members demanded. While it might be said that Petitioner was the "paymaster" of the contractual overpayments, everything that Petitioner did was with the pre-approval and knowledge and consent of the Board. Unlike Kennedy, who was fired for stealing from the Church, no such allegations were ever made about Petitioner.

**(v)** **the degree to which the defendant stood to benefit from the criminal activity.**
Here is where the proof is clearly in Petitioner's favor. Each and every one of the Board Members has used the unlawful private inurement from the Church to build vacation homes on Cape Cod and put their children through elite universities on full tax-free scholarships and on a tax-free basis with money meant for the poor. Since Petitioner's arrest and unlawful conviction, the actual charitable works of the Church have ceased. Since Petitioner's arrest and unlawful conviction, the actual charitable works of the Church have come to an abrupt halt, and yet the Church has taken in over $20 million with virtually nothing going to any charitable causes as required by law. The Statute of Limitations for charitable tax fraud is six years, and the AUSAs reading this brief should immediately refer this case to the IRS-CID as Officers of the Court and as part of the Department of Justice. They have not just the power to investigate the outright tax fraud going on at the Church, they have a duty to do so. But, of course, with the government's preoccupation and fascination with the legend of Whitey Bulger from 30 years ago, it is not surprising that the massive tax fraud known as the Church on the Hill continues to operate in the open just miles from the Joseph J. Moakley Courthouse, while none of the Boston Homeless enjoy any meals previously provided by the Petitioner.

Therefore, in light of the clear wording and intent of SGA 794 and the obvious over-

sentencing of Petitioner, Petitioner respectfully requests this Court to review the enclosed facts,

reconsider Petitioner's sentence in light of SGA 794, and then resentence him to time served and

order his immediate release from prison in the interests of justice.

## IV.    OTHER SENTENCING ERRORS BY THE COURT REQUIRE PETITIONER TO BE RESENTENCED TO TIME SERVED AND IMMEDIATELY RELEASED

In its recent decision in *Rosales-Mireles v. United States,* 138 S.Ct. 1897 (2018), where the

defendant's sentence was vacated based on a single small error in the miscalculation of the

Sentencing Guidelines, the Supreme Court stated the following:

> When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Rosales-Mireles* at 1907, *citing Molina-Martinez v. United States*, 136 S.Ct. 1338, 1345 (2016).

The district court has the ultimate responsibility to ensure that the Guidelines range it

considers is correct, and the "[f]ailure to calculate the correct Guidelines range constitutes

procedural error." *Peugh* at 537. Given the complexity of the calculation, however, district courts

sometimes make mistakes. It is unsurprising, then, that "there will be instances when a district

court's sentencing of a defendant within the framework of an incorrect Guidelines range goes

unnoticed" by the parties as well, which may result in a defendant raising the error for the first

time on appeal as happened in *Molina–Martinez.*

The risk of unnecessary deprivation of liberty as has happened in this case particularly

undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a

plain Guidelines error because of the role the district court plays in calculating the range and the

relative ease of correcting the error. Unlike "case[s] where trial strategies, in retrospect, might be

criticized for leading to a harsher sentence," Guidelines miscalculations ultimately result from

judicial error. *Glover* at 204; *see also Peugh* at 537. *See United States v. Gonzalez-Castillo,* 562

F.3d 80, 84 (1st Cir. 2009), where the First Circuit stated that "[i]t is well-established that a criminal defendant holds a due process right to be sentenced upon information which is not false or materially incorrect. *United States v. Pellerito*, 918 F.2d 999, 1002 (1st Cir.1990)." Moreover, "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Molina-Martinez* at 1348-49. "A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." *United States v. Williams,* 399 F.3d 450, 456 (2d Cir. 2005).

In *Molina–Martinez,* the Court recognized that "[w]hen a defendant is sentenced under an incorrect Guidelines range - whether or not the defendant's ultimate sentence falls within the correct range - the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 1345. In other words, an error resulting in a higher range than the Guidelines provide usually establishes on its own a reasonable probability that a defendant will serve a sentence that is more than necessary to fulfill the purposes of incarceration. 18 U.S.C. §3553(a); *Tapia* at 325. "To a prisoner," this prospect of additional "time behind bars is not some theoretical or mathematical concept." *Barber v. Thomas,* 560 U.S. 474, 504 (2010). "[A]ny amount of actual jail time" is significant for Sixth Amendment purposes, *Glover v. United States,* 531 U.S. 198, 203 (2001), and "ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration," *United States v. Jenkins,* 854 F.3d 181, 192 (2d Cir. 2017). The possibility of additional jail time thus warrants serious consideration in a determination whether to exercise discretion under Rule 52(b). It is crucial in maintaining public perception of fairness and integrity in the justice system that courts exhibit regard for fundamental rights and respect for prisoners "as people."

17

Ensuring the accuracy of Guidelines determinations also serves the purpose of "providing certainty and fairness in sentencing" on a greater scale. 28 U.S.C. §994(f); *see also* §991(b)(1)(B); *Booker* at 264. The Guidelines assist federal courts across the country in achieving uniformity and proportionality in sentencing. *See Rita* at 349. To realize those goals, it is important that sentencing proceedings actually reflect the nature of the offense and criminal history of the defendant, because the United States Sentencing Commission relies on data developed during sentencing proceedings, including information in the presentence investigation report, to determine whether revisions to the Guidelines are necessary. *See id.* at 350. When sentences based on incorrect Guidelines ranges go uncorrected, the Commission's ability to make appropriate amendments is undermined.

In broad strokes, the public legitimacy of our justice system relies on procedures that are "neutral, accurate, consistent, trustworthy, and fair," and that "provide opportunities for error correction." In considering claims like Petitioner's in this case, "what reasonable citizen wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?" *United States v. Sabillon–Umana,* 772 F.3d 1328, 1333–34 (10th Cir. 2014). As the Supreme Court has repeatedly explained: "the Guidelines are 'the starting point for every sentencing calculation in the federal system,'" *Hughes v. United States,* 138 S.Ct. 1765, 1775 (2018), *quoting Peugh* at 542. The error in Petitioner's case is clearly manifest for the reasons stated below and must be corrected.

In *Rosales-Mireles*, the simple mistake made in calculating the guidelines that constituted plain error was the defendant's Criminal History and Offense Level were calculated at Criminal History III instead of II (just as in this case), which resulted in Plain Error under Rule 52(b) and *United States v. Olano*, 113 S.Ct. 1770 (1993) requiring the defendant's sentence to be vacated.

The Supreme Court went on to state that: "The risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error because of the role the district court plays in calculating the range and the relative ease of correcting the error." *Rosales-Mireles* at 8. In this case, the Petitioner should have been sentenced based on a Criminal History of I or II at worst, because the four crimes suggested by the government were not within the proper time frame, nor did they result in Petitioner being incarcerated for more than a year and a month as is required by the Sentencing Guidelines for a previous crime to be included in the defendant's Criminal History calculation. Therefore, if a minor mistake in *Rosales-Mireles* required new sentencing as Plain Error, then clearly the major errors here requires resentencing as well.

Similarly, in *Molina–Martinez,* the minor mistake was a simple miscalculation of the correct Sentencing Guidelines range, which arguably the district court was only off by one month. Whereas in this case, the district court was off by more than 10 years in its sentencing calculations for a whole host of sentencing errors, and each one of those enhancements will not be just proven to be unfounded and misguided, but plainly erroneous as well just as the Supreme Court found in *Rosales-Mireles* and *Molina–Martinez*. Instead of an Offense Level of 31, reduced by 3 Levels for Acceptance of Responsibility, Petitioner will demonstrate in this motion that his Base Level of 7 should have been reduced 4 Levels pursuant to SGA 794 to 3, and then reduced by the same Acceptance of Responsibility 3 Levels for a final Offense Level of Zero, which should have resulted in a sentence of time served or Probation. Each of Petitioner's Sentencing Enhancements was clearly erroneous as a matter of law, and Plainly Erroneous pursuant to *Rosales-Mireles* and *Molina–Martinez*. *See, also, United States v. Marrero-Perez*, 914 F.3d 20 (1 Cir. 2019) *citing Molina-Martinez* and *Nelson v. Colorado*, 137 S.Ct. 1249 (2017).

Not only is there no evidence at all to support a 4-Level Enhancement for a Leadership Role when there is no listing of the names of the five Criminally Culpable Participants that Petitioner allegedly was the leader of, Petitioner was certainly not the leader of the Church and he was only two years old when the Church created the original tax fraud involving the Bostonview Apartments that remain the "cash cow" for the tax-exempt trough for Board Members that has been going strong for the 7 years since Petitioner has been incarcerated. Tom Kennedy is the only other person to do prison time in this matter, and it is indisputable that Petitioner worked for Kennedy and not vice versa. There is no list of five criminally culpable participants in either the Indictment or the PSR that satisfies the government's burden of proof by a preponderance of the evidence. Aside from the government's spurious, baseless, and specious claims, there is no evidence anywhere whatsoever to support the clearly erroneous 4-Level enhancement for being the organizer of the Church fraud or the leader of the fraud at the Church.

Similarly speculative and devoid of any support is the government's allegation that "the defendant misrepresented that he was acting on behalf of a religious organization when perpetuating the fraud scheme." Not only is this enhancement totally unwarranted, it borders on the absurd. Throughout the Indictment and the PSR, and even in the very next enhancement in the PSR, the government claims and alleges that the Petitioner was the "Director of Operation (sic) at the Church." Once again, the only person actually doing charitable work at the church was the Petitioner. When the Petitioner was arrested, the charitable activities of the Church began to fade until they all but ceased. The Church continues to be one massive tax fraud, and the Petitioner was the only truly charitable person in the entire organization. The 2-Level Enhancement for misrepresenting a religious organization should be reserved exclusively for someone who raises money falsely representing that he is with the Catholic Church helping the homeless and then turns

the money over to ISIS terrorists or some other odious cause. In that type of fraud, no money goes to the poor and needy. However, in this case, the Petitioner at all times for almost a decade was not only legitimately affiliated with the Church, but singlehandedly ran the only programs helping the truly destitute and needy. So, once again, not only does the government lack any evidence to support this enhancement, the government's claim is not just unsupported; it is diametrically opposed to the truth.

Furthermore, the claim that Petitioner abused a "position of trust" flies in the face of the government's other claims in this case. It is virtually impossible as a matter of law as well as logically inconceivable that the Petitioner can be the "leader" of the Church and the fraud, while at the same time "misrepresent" to anyone that he is working for the Church as well as allegedly "abusing his position of trust" as the Director of Operations. This is similar to people wanting to impeach the President for "abusing his position of trust" simply because they disagree with his methods and motives. In this case the government's arguments have crossed the line from the implausible to the legally impossible and unsupportable.

But, the government does not stop there in its adventure into the absurd. Its claim that there was anything "sophisticated" going on here is belied by its own indictment, which does not even lay out the facts or elements necessary to sustain a commercial bribery scheme that is covered by state law, much less a federal RICO claim. The government should be embarrassed talking about the Church giving a scholarship to the children of the person who has run the Bostonview Apartments for the Church for over 20 years. The father of the children going to Quinnipiac and Boston College has done more for the Church than all of the Board Members combined. Similarly embarrassing is the story of the Aquarium servicing company. It is good news to know that with all of the books written about the relationship between Whitey Bulger and the FBI in Boston, the

government had time to prosecute the Aquarium "crime" in Federal Court. Moreover, this Court should order that the government turn over all records from Sovereign Bank showing any account that Petitioner controlled. When they fail to do that, this Court should sanction the prosecutors just like the Honorable Emmet Sullivan did in the Senator Ted Stevens case.

Even giving the government the benefit of the doubt that they never gave Petitioner, this Indictment does not even meet the elements of a federal fraud, much less a "sophisticated" one. According to the government's Indictment, the Petitioner shook down suppliers by giving them an autographed copy of his book, and then took the kick-backs and shared them with each and every member of the Board. There is nothing sophisticated about giving money to Board Members under the table. More importantly, there was no evidence provided anywhere that Petitioner had an account at Sovereign, much less used it for a "sophisticated" fraud. The details in the Indictment do not present a federal crime because the vendors were purposefully overpaid by the Church so that the overpayment could be remitted back under the table in cash to the Board Members.

In her seminal article for the NYU Journal of Law and Business (Issue 12.1, Fall 2015), Judge Patti Saris, the former Chair of the Sentencing Guidelines Commission, stated that the Guidelines had to change for defendants in the same position that Petitioner finds himself in, because the Amendment would "properly direct that the enhancement *should not apply* to a defendant who may have no knowledge of or participation in the sophisticated aspects of the crime because he or she is performing a role…which *does not involve sophistication*." The other problem with the "sophisticated means" enhancement was that it flies in the face of SGA 792, which changed it as follows:

> Amendment 792 provides that the two-level increase applies if the offense "involved sophisticated means *and the defendant intentionally engaged in or caused the conduct constituting sophisticated means*." U.S.S.G. §2B1.1(b)(10)(C) (2015) (emphasis added).

22

Clearly the "Sophisticated" Means Enhancement does not apply here. But, perhaps the biggest and clearest error by the Court is enhancing Petitioner's Guidelines Level by 14 for a non-existent loss that he did not intend pursuant to SGA 792. All payments were approved by the Board, so it is unclear how any of this can be considered a "loss" for the purposes of SGA 792.

Amendment 792, which became effective on November 1, 2015, essentially settled a dispute among the Circuits by adopting the *Manatau* Standard below and the existing law in the Second Circuit of a subjective measure of intended loss. U.S.S.G. Supp. App. C, Amend. No. 792, at 110-14 (2015). Under the revised commentary to U.S.S.G. §§2B1.1, Application Note 3(A)(ii), Amendment 792 adopts the *Manatau* Standard and is in line with *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008), confirming that intended loss under §§2B1.1 means only the pecuniary harm that the defendant purposefully sought to inflict. For example, in *Confredo*, the Second Circuit remanded a loan fraud case to Judge Sand of the Southern District of New York for consideration at resentencing of whether the defendant's experience as a loan officer, understanding of the loan denial and approval processes, and expectations regarding the borrowers financial capabilities, justified a finding that the loss he intended to inflict on the bank through the fraudulent loan applications was less than the face amount of each loan.

The newly adopted *Manatau* Standard in the amended Sentencing Guidelines is very important to Petitioner's case for several reasons. First, a defendant's Sentencing Guidelines should only be based on the amount of loss that the defendant himself actually intended to inflict on the victim(s). As is clear from the evidence of the case, it is difficult to imagine how there could be any "intentional" infliction of loss, or even an "actual loss" to real victims for that matter. Second, and perhaps even more important to Petitioner's sentencing in this case, is that with the new Sentencing Guidelines adopting the new *Manatau* Standard, the Commission also adopted the

"*mens rea*" standard of *Morissette v. United States*, 342 U.S. 246 (1952), which holds that for the defendant's conduct to be criminal, he must have actually known that he was breaking the law and that he was intentionally causing "criminal" harm to the victim.  As was stated in *Manatau*:

> But it is equally true that American criminal law often restricts liability to cases where an intentional choice to do a wrong is present. As Justice Jackson explained, "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250. The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter. The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051.

In fact, under the new Sentencing Guidelines, the definition of "intended loss" makes no mention of "knowledge" or some lesser "*mens rea*" standard and includes only the harm the defendant actually "intended" himself to inflict on the victims. To contrast this, all of the enhancements are clearly erroneous for the reasons discussed above. These are the points that the Government altogether misses and ignores in its specious analysis of loss in this case. The amended Sentencing Guidelines demonstrate the clear error in the Government's thinking.  Even if there was a loss in this case, which there wasn't, the loss should not and could not be held against Petitioner for the purposes of establishing his Sentencing Guidelines. Therefore, no "intended loss" or "tangible economic harm" can be said to have resulted from the scheme of which Petitioner stands accused of based on the new standard adopted by Amendment 792.

The Court is also required to allocate the loss amongst the alleged conspirators.  This the Court did not do, and certainly the Court did not allocate any of the loss among the government's list of co-conspirators. If zero loss was reallocated to all of the alleged co-conspirators in this case, then Petitioner is entitled to a maximum Offense Level of Seven minus the Four-Level Reduction for "minimal" participation in a conspiracy that he did not even know existed and was not a willing

24

participant in, and minus the Three-Level Reduction for Acceptance of Responsibility, he is entitled to a Final Offense Level of Zero under the new Sentencing Guidelines Amendments 792 and 794. Therefore, if the Court correctly recalculates Petitioner's new amended Sentencing Guidelines Offense Level, there is a Base Level of 7, minus 4 for the SGA 794 Mitigating Role Adjustment, and minus 3 for Acceptance of Responsibility, for a total Offense Level of zero, which means the sentence should have been probation or time served as Petitioner had already been at Wyatt for an extended period of time.

## CONCLUSION

Therefore, based on Amendment 794 as a clarifying amendment, this Court should reduce Petitioner's sentence to time-served and order his immediate release from prison.

Respectfully Submitted,

Edward Mackenzie
Incarcerated Inmate
Petitioner, *pro se*
Reg. #17938-038
FMC Devens
Satellite Camp
P.O. Box 879
Ayer, MA 01432