UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD MACKENZIE,<br><br>  Defendant | CRIMINAL No. 13-cr-10149-FDS |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR MODIFICATION OF HIS SENTENCE
=====

The Government opposes the defendant, Edward MacKenzie's Emergency Motion for Modification of His Sentence (the "Defendant's Motion"). ECF No. 172. MacKenzie fails to demonstrate extraordinary and compelling reasons for erasing the remaining 40 months of his sentence. None of the COVID-19 risk factors apply—he is 61 years old, in relatively good health, with well-controlled hypertension and nasal congestion. MacKenzie is unsuitable for home confinement because of his violent criminal history (as the Bureau of Prisons found) and his past abuse and exploitation of his children. Finally, MacKenzie's generalized fears about the spread of COVID-19 apply to all detainees and are mitigated by the stringent protocols—which, to date, are entirely successful—put in place to protect detainees at Federal Medical Camp Devens from the threat to health and safety posed by COVID-19.

I.   BACKGROUND

   A.   **This is MacKenzie's Latest Attempt to Dodge His Remaining 40-Month Sentence.**

MacKenzie, a life-long con man and violent felon, has about 40 months left to serve of his 12-year sentence for hijacking and defrauding a Boston church, the Boston Society of New

Jerusalem.  On October 21, 2014, MacKenzie pleaded guilty to RICO conspiracy in violation of 18 U.S.C. § 1962(d), racketeering in violation of 18 U.S.C. § 1962(c), money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 1956(a)(1)(B)(i), two counts of mail fraud conspiracy in violation of 18 U.S.C. § 1349, and eight counts of wire fraud in violation of 18 U.S.C. § 1343.  Rule 11 Hr'g, ECF No. 95.  The Court sentenced MacKenzie to 144 months of incarceration, imposing an upward departure of 24 months above the guideline sentencing range.  Sentencing Tr., ECF No. 131 at 21 ("[MacKenzie] has engaged in a multi-year, decade-long episode of criminal activity that was complex and sophisticated and driven as near as I can tell entirely by greed.").

After conviction, MacKenzie has repeatedly tried to contest or reduce his sentence, without success.  First MacKenzie appealed his sentence by filing a notice of appeal on March 12, 2015.  ECF No. 108.  The First Circuit affirmed MacKenzie's sentence on October 4, 2016, finding "MacKenzie's incorrigibility is impossible to ignore, and the district court reasonably viewed a long prison term as a grim necessity to protect the public."  First Cir. J., No. 15-1339 at 1, ECF No. 137.  Next, MacKenzie moved for a writ of habeas corpus under 28 U.S.C. § 2233 alleging ineffective assistance of counsel and that sentencing guideline amendments 791 and 792 should be applied retroactively to lower the guideline range, among other arguments.  ECF No. 141.  The Court denied the petition on November 16, 2017.  ECF No. 148.  MacKenzie filed another motion to modify his sentence, this time under 18 U.S.C. § 3582(c)(2), asserting many of the same arguments, which the Court denied on May 9, 2019.  ECF Nos. 161 and 168.  Now MacKenzie seeks to capitalize on the COVID-19 pandemic by moving for compassionate release under 18 U.S.C. § 3582(c).

### B.     The Bureau of Prisons Found MacKenzie Unfit for Home Confinement.

In light of this unprecedented health crisis, the Attorney General has directed the Bureau of Prisons ("BOP") to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors. Mems. from William P. Barr to Michael Carvajal dated Mar. 26, 2020 and Apr. 3, 2020; ECF No. 172-2.  BOP is devoting all available resources to executing that directive and has already placed more than 1,280 inmates on home confinement.  BOP COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus/ (last accessed April 21, 2020).

The Federal Medical Center, Devens ("FMC Devens") has already identified 24 inmates as eligible for home confinement, but MacKenzie was not one of them.  MacKenzie sent the Warden of FMC Devens a request for release to home confinement on or about March 25, 2020. ECF No. 172-1.  FMC Devens has informed the government that MacKenzie was reviewed for release under the Elderly Offender Program of the First Step Act and the CARES Act, but found ineligible because of his prior conviction of armed robbery.  (The armed robbery charge arose after the defendant used a shotgun to steal $1,033 cash and $2,500 worth of marijuana from a victim.  Exhibit A, MacKenzie's 2015 Pre-Sentence Report at ¶ 120.)  FMC Devens informed the government that MacKenzie will not be reviewed for home confinement under the Second Chance Act because his projected release date of August 12, 2023 does not fall within the next 17-19 months.

## II.     LEGAL PRINCIPLES

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c).  The statute, as amended by Section 603(b) of the First Step Act, allows the court to consider a defendant's motion for compassionate

release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

> The court ***may not modify a term of imprisonment once it has been imposed except that***, . . . the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, ***may reduce the term of imprisonment***…

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

A defendant is only eligible for compassionate release if the court finds, (a) "***extraordinary and compelling reasons*** warrant such a reduction," after "considering the factors set forth in section 3553(a) to the extent they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added); or (b) that the defendant is at least 70 years old and has served at least 30 years in prison, among other things. 18 U.S.C. § 3582(c)(1)(A)(ii); *See also* U.S.S.G. § 1B1.13. In either case, the proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission" and the defendant "cannot be a danger to the safety to any other person or the community." 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13(2).

The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. These include an assessment of the defendant's medical condition, age, family circumstances, and other reasons:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—

>> (I) suffering from a serious physical or medical condition,
>
>> (II) suffering from a serious functional or cognitive impairment, or
>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 Application Note 1.

The policy statement is not the only source of criteria a court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction. Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*, n. 1(D). Accordingly, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.

That regulation appears at BOP Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This program statement contains standards that are both more extensive than and slightly different from those stated in the § 1B1.13 policy statement. As is relevant here, the program statement defines a "debilitated medical condition" as follows:

> Debilitated Medical Condition. RIS[1] consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. The BOP should consider a RIS if the inmate is:
>
> - Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
>
> - Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.
>
> The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function). A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Program Statement 5050.50 at 5.

## III.   ARGUMENT

MacKenzie should not be absolved of the remaining 40 months of his sentence. MacKenzie does not meet the requirements for release under Section 3582(c)(1)(A)(ii)—he is not more than 70 years old and not served over 30 years in prison. Thus MacKenzie must demonstrate "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i).[2] MacKenzie cannot meet this high bar: he is in good health, middle-aged, and

---

[1] RIS refers to a "reduction in sentence." Program Statement 5050.50 at 4.

[2] The exhaustion requirement will likely be met by the time the Court considers the Defendant's Motion. A court may consider a defendant's request 30 days after MacKenzie's request by the warden of the defendant's facility. 18 U.S.C. § 3582(c)(1)(A). Assuming

his history of criminal violence and exploitation makes him a danger to his family as well as the public.  Moreover MacKenzie's community outreach efforts and speculative, generalized fears about COVID-19 fall far short of the legal requirements for compassionate release.  Thus, the Court should endorse the BOP's denial of MacKenzie's home confinement request and require MacKenzie to serve the remainder of his sentence.

> **A.    MacKenzie's Age and Medical Condition Do Not Present Extraordinary or Compelling Reasons for Release**

MacKenzie claims he is at a higher risk for contracting COVID-19 because he is "sixty two years old and he suffers from [h]igh [b]lood [p]ressure and other respiratory disease for which he takes amLODIPine and uses [Fluticasone], nasal spray."  Defendant's Motion at 1.  Each of these claims is factually false and legally unpersuasive.

MacKenzie has none of the underlying conditions that the CDC has identified as creating a high risk of serious illness from COVID-19, such as:

- Being 65 years and older
- Living in a nursing home or long-term care facility
- Having chronic lung disease or moderate to severe asthma
- Having serious heart conditions
- Being immunocompromised
- Having severe obesity (body mass index [BMI] of 40 or higher)
- Having diabetes
- Having chronic kidney disease undergoing dialysis
- Having liver disease

see https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

MacKenzie is not 65; nor is he 62 as he states in his Motion; he is only 61 years-old, and his medical records show that he is in relatively good health.  Exhibit B, MacKenzie's 2020

---

MacKenzie's request for compassionate release was received by BOP on or near March 25, 2020, MacKenzie's motion will be ripe for adjudication by approximately April 24, 2020.

Medical Records.  Like half of all American adults, MacKenzie has high blood Pressure.  CDC's Facts About Hypertension, https://www.cdc.gov/bloodpressure/facts.htm.  High blood pressure is not a recognized risk factor for contracting and suffering severe effects from COVID-19.  Moreover, MacKenzie's high blood pressure appears to be well-controlled by his medication—his most recent blood pressure measurement, taken in December 2019, was normal: 115/80.  Exhibit C, MacKenzie's 2019 Medical Records at 1.  Nor does MacKenzie have a respiratory disease that would place him at higher risk if he contracted COVID-19.  His medical records show he uses nasal spray for allergies and rhinitis—frequent sneezing and a congested, drippy nose—which he attributes to breaking his nose several times as a fighter.  *Id.* at 69.

Compassionate release on the basis of medical condition is a "rare" event, and MacKenzie's high blood pressure and nasal congestion do not qualify him for early release.  *See United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019).  The Sentencing Commission's policy statement provides that, in order for an inmate to be released because of a medical condition, that inmate must be suffering from a "terminal illness," or from "a serious physical or medical condition, […] a serious functional or cognitive impairment, […] or […] experiencing deteriorating physical or mental health because of the aging process." U.S.S.G. § 1B1.13 n. 1.  These conditions qualify as extraordinary and compelling reasons only when they "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  *Id*.  The BOP program statement 5050.50 defines debilitated medical condition as "completely disabled, meaning the inmate cannot carry one any self-care and is totally confined to a bed or chair; or capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."  Program Statement 5050.50 at 5.  Moreover, chronic conditions that can be managed in

prison, like MacKenzie's, are an insufficient basis for compassionate release. *United States v. Ayon-Nunez*, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) (denying motion of a defendant who claimed severe back injuries and epilepsy).

### B. Family Circumstances do not justify MacKenzie's release

Nor do MacKenzie's family circumstances justify reducing his sentence. MacKenzie argues that he should be released so he can assume custody of his 3-year-old grandson after his daughter Devin's recent death. Defendant's Motion, ECF No. 172 at 8. This, however is not grounds for compelling or extraordinary relief and is factually implausible given MacKenzie's criminal history and his past exploitation of his children, including his daughter Devin.

The Sentencing Commission states that family circumstances may comprise compelling and extraordinary circumstances upon the "death or incapacitation of the caregiver of the defendant's minor child" or the "incapacitation of the defendant's spouse … when the defendant would be the only available caregiver for the spouse." U.S.S.G. § 1B1.13 at n. 1. MacKenzie does not meet any of these conditions—he has no minor children and no spouse or registered partner.

Moreover, MacKenzie's claim that he is "going to formally adopt [his grandson] and care for him upon" is highly unlikely given MacKenzie's criminal and family history. *See* Defendant's letter to Warden Spaulding, ECF No. 172-1 at 4. During his pre-trial detention MacKenzie repeatedly tried to manipulate and exploit his daughters for his own benefit, including:

- using his daughter to seek $5,000 from a co-conspirator in return for MacKenzie agreeing to "protect" him by not providing information against him in this case, Exhibit A, MacKenzie 2015 PSR at ¶¶ 110-113;
- encouraging his daughter to lie to Quincy District Court on his behalf, *id*. at ¶¶ 114-115;

9

- attempting to arrange for one of his daughters (Devin) to have a sexual relationship with a "nasty" inmate whom MacKenzie met in jail in exchange for money, *id.* at ¶ 190; and

- encouraging his daughter (Devin) to have sexual relations with his girlfriend while MacKenzie was in jail so that his girlfriend did not sleep with other men, *id.* at ¶ 191.

MacKenzie's behavior was a continuation of his past abuse of his family members: MacKenzie's daughter, Devin, and two of MacKenzie's domestic partners were awarded abuse prevention orders against MacKenzie at various times. *Id.* at ¶¶ 182-183, 188. Instead of providing care and support, MacKenzie's release to home confinement is likely to pose a danger to his family as well as the community. *See* U.S.S.G. § 1B1.13(2)

    **C.**  **Mackenzie's Alleged Rehabilitation Is Not a Basis For a Sentence Reduction.**

  The Defendant's Motion relies heavily on his participation in the Devens Community Outreach program, which connects detainees with high school and college students. But "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for compassionate release. 28 U.S.C. § 994(t). In *United States v. Brown*, for example, the court denied a motion for compassionate release even though BOP stated that the defendant "exhibited an exemplary rehabilitative effort" including 6000 hours of programming, and "exceptional skill in supporting his peers." 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019). Even if MacKenzie had provided such laurels—which he does not—they would be insufficient to demonstrate extraordinary and compelling circumstances. Moreover, the government views MacKenzie's "community outreach" efforts with some skepticism. MacKenzie previously received numerous awards and accolades from the Governor of Massachusetts, the Massachusetts Senate, and the Massachusetts House of Representatives for his work with youth in Boston communities—all while defrauding hundreds of thousands of dollars from the Boston Society of New Jerusalem. Exhibit A at ¶ 204.

### D. Speculative Claims About COVID-19 are Insufficient.

While the government appreciates the gravity of the COVID-19 pandemic, and acknowledges that it presents a national and state public health emergency, MacKenzie's motion fails because the risk of COVID-19 alone is not an "extraordinary and compelling reason" for compassionate release. *See, e.g., Raia*, 2020 WL 1647922 at *2 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Weeks*, 2020 WL 1862634 at *3 (S.D.N.Y April 14, 2020) ("Weeks has not set forth extraordinary and compelling reasons for him to be released early.  All he has done is to note that he is in prison and there is a COVID-19 outbreak nationwide.  That is not enough."); *United States v. Feiling*, 2020 WL 1821457 at *7 (E.D.Va. April 10, 2020) ("In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. … Notably, 'the *fear* of contracting a communicable disease' proves insufficient to justify a sentence modification.") (citation omitted) (emphasis in original); *Gillis*, 2020 WL 1846792 at *3 ("Absent the current COVID-19 crisis, [the defendant's] condition would come nowhere near the 'extraordinary compelling' standard required") (denying release).

Neither the government, nor the BOP, minimize the concern or risk from COVID-19. The BOP has taken aggressive action to mitigate the effects of COVID-19, and has been taking proactive steps to prevent potential coronavirus transmissions for months. *See* Updates to BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last accessed on April 20, 2020).  On March 13, 2020, after consulting with the Centers for

Disease Control and reviewing guidance from the World Health Organization, the BOP released its multistep action plan to minimize the risk of COVID-19 in its facilities. The BOP continues to update its plan as it gathers additional information and resources to better manage and protect its inmate population.

The BOP has implemented several preventive measures, including, but not limited to, the following:

1. **Inmate and Staff Screenings**: Effective April 1, 2020 all inmates in every institution will be secured in their assigned space for 14 days. All incoming inmates are quarantined for 14 days, and screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees Fahrenheit or higher will be barred from the facility on that basis alone.) Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

2. **Quarantine Logistics**: All BOP institutions have assessed their stockpiles of food, medicines, and sanitation supplies, and established quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

3. **Suspension of Social Visits and Tours:** The BOP has placed a 30-day hold on all social visits. To ensure that familial relationships are maintained throughout this disruption, all detainees' telephone allowances have been increased to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the BOP's Action Plan is in effect.

4. **Suspension of Legal Visits**: The BOP has also placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.  Consistent with this new policy, FMC Devens's website indicates that "All visiting at this facility has been suspended until further notice." https://www.bop.gov/locations/institutions/dev/  (last visited on April 21, 2020).

5. **Suspension of Inmate Movements**: BOP has also suspended the movement of

inmates and detainees among its facilities for at least the first 30 days that the Action Plan is in effect. Though there will be exceptions for medical treatment and similar exigencies, this will prevent transmissions between institutional populations. **The BOP has emphasized that all inmates, regardless of where they are being housed, are screened for COVID-19 prior to movement. Both the BOP and USMS are using screening protocols for both inmates and staff.** Likewise, all official staff travel has been cancelled, as has most staff training.

6. **Modified Operations**: Wardens at BOP facilities have modified operations, such as staggering of meal times and recreation time, to maximize social distancing.

*See* BOP COVID-19 Resource Page at https://www.bop.gov/coronavirus/index.jsp. Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission at BOP institutions. So far these measures appear to be working at Devens, which has yet to report a single confirmed case of COVID-19 of any detainee or staff member.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Emergency Motion for Modification of His Sentence.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Elysa Q. Wan*
ELYSA WAN
ZACHARY R. HAFER
DUSTIN CHAO
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

>*/s/ Elysa Q. Wan*
>Elysa Wan
>Assistant United States Attorney

Date: April 21, 2020