# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR THE IMMEDIATE TERMINATION OF PETITIONER'S SUPERVISED RELEASE PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. §3583(e)(1) AND THE COURT'S INHERENT POWER UNDER 28 U.S.C. §2243

## PRELIMINARY STATEMENT

As an Elderly Offender over Age 60, Petitioner was entitled to one-third off his sentence. At the very least he was entitled to 22 months off his sentence as Earned Time Credits under the First Step Act (FSA) and the CARES Act. If this Court continues to delay Petitioner's release under the First Step Act, then Petitioner would be entitled to at least $2,000,000 in compensation as determined by Judge O'Toole in *Waters v. Town of Ayer* and Judge Gertner in *Limone*. In fact, in her decision in *Drumgold v. Callahan*, Judge Gertner gave a detailed analysis of why the family of the famous Gangster Peter Limone was entitled to over $100,000,000 in damages for his wrongful incarceration:

> In this case, the jury awarded a total of $14 million, or approximately $1 million per year of Drumgold's incarceration. The question is whether that award "shocks the conscience." Compensation of $1 million per year of imprisonment is not automatic. That I awarded a similar sum for unjust imprisonment in *Limone v. United States*, 497 F.Supp.2d 143, 243–45 (D.Mass.2007), *aff'd*, 579 F.3d 79 (1st Cir.2009), is mere coincidence. Judge O'Toole in *Waters v. Town of Ayer*, No. 04–10521–GAO, 2009 WL 3489372, at *3 (D.Mass. Sept. 17, 2009), by contrast, chose to award damages at the rate of $1,000 per day for unjust imprisonment. The fact finder has discretion to award damages according to the harm caused to the particular plaintiff in front of them, in light of all of the circumstances of a given case. When I was in the shoes of the fact-finder, I wrote:
>
>> Losses of this magnitude are almost impossible to catalogue. The loss of liberty. The loss of the enjoyment of their families. The loss of the ability to care for and nurture their children. The loss of intimacy and closeness with their spouses. Indeed, the task of quantifying these losses—which I am obliged to do—is among the most difficult this Court has ever had to undertake.
>
> *Limone*, 497 F.Supp.2d at 243. I noted then that in recent cases, both juries and courts had awarded wrongfully imprisoned plaintiffs damages worth $1 million per year of false

imprisonment. *Id.* (citing *Ramirez v. Los Angeles County Sheriff's Office,* 2006 WL 1428310 (C.D.Cal. Feb. 16, 2006) ($18 million in compensatory damages for malicious prosecution that resulted in ten months' incarceration)); *Mark Bravo v. Giblin,* (Cal.App.2d Dist. Nov. 18, 2002) ("$3,537,000 to compensate [plaintiff] for 1,179 days of incarceration at the rate of $3,000 per day" or $1,095,000 per year, in addition to $1 million for emotional damages suffered prior to sentencing); *Newsome v. McCabe,* 319 F.3d 301 (7th Cir.2003), ($15 million in compensatory damages for malicious prosecution that resulted in 15 years imprisonment, or $1 million per year); *Jones v. City of Chicago,* No. 83 C 2430, 1987 WL 19800, at *1 (N.D.Ill. Nov. 10, 1987) *aff'd*, 856 F.2d 985 (7th Cir.1988) ("$71,100 for false arrest; $71,100 for intentional infliction of emotional distress; $355,500 for false imprisonment; and $213,300 for malicious prosecution" resulting in one month's imprisonment, or $8,532,000 per year).

*Drumgold v. Callahan*, 806 F. Supp. 2d 405, 426–27 (D. Mass. 2011), as amended (Aug. 24, 2011), 707 F.3d 28 (1st Cir. 2013).

Based on Judge Gertner's analysis in *Drumgold v. Callahan*, the Government already owes Petitioner $2,000,000 and further delays will only cost the Government more in depriving someone of their freedom to get a job and take care of their family as they get back into Society which was the whole purpose of the First Step Act.

# I. CRITERIA FOR ENDING SUPERVISED RELEASE

The Judicial Conference on Criminal Law has elaborated on 18 U.S.C. § 3583(e)(1)'s statutory criteria and recommended that probation officers as well as the Court evaluate nine factors when deciding whether to approve early termination of Supervised Release.

Those factors are:

1) Stable community reintegration (e.g., residence, family, employment);

2) Progressive strides toward supervision objectives and in compliance with all conditions of supervision;

3) No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

4) No history of violence;

5) No recent arrests or convictions;

6) No recent evidence of alcohol or drug abuse;

7) No recent psychiatric episodes;

8) No identifiable risk to the safety of any identifiable victim; and

9) No identifiable risk to public safety based on the Risk Prediction Index.

*See e.g. United States v. Filocomo*, No. 02CR30731S16 (NGG), 2022 WL 118735, at *1 (E.D.N.Y. Jan. 12, 2022). Ronald Filocomo was the head of a notorious crime family and allegedly killed a number of people – but was released early.

## II. THE FIRST STEP ACT

Enacted on December 21, 2018, the First Step Act (hereinafter "FSA") was the result of a bipartisan legislative effort to overhaul the criminal justice system and provide Earned Time Credits for the reduction in sentences for nonviolent elderly offenders as well as other drug-based crimes that receive extraordinarily long sentences. Congress aimed to enhance public safety by improving the effectiveness and efficiency of the federal prison system with a new Risk and Needs Assessment Program known as PATTERN, and everyone would receive a PATTERN Score so that they could be assessed for whether they receive 10 or 15 days a month off for those determined to be low risk, nonviolent offenders. See 18 U.S.C. §3632(d)(4)(A):

The Act also makes clear that "[T]ime credits earned under this paragraph by prisoners that actively participate in recidivism or activities **shall be applied to time in prerelease custody or supervised release.** The Director of the Bureau of Prisons shall transfer eligible prisoners as determined under §3624(g) into prelease custody or supervised release." *Id.* Furthermore, under the federal sentencing statutes: "[I]f the Sentencing Court included as part of the prisoner's sentence a requirement that the prisoner be placed on a term of Supervised Release after imprisonment...the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date...based on the application of earned time credits under §3532." See §3521(g)(3).

Petitioner's sentence included three (3) years of Supervised Release, and therefore under application of the FSA, the Earned Time Credits Petitioner earned should be used to reduce his period of Supervised Release. Additionally, §3632(d)(6) provides: "In addition, the incentives described in this Subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible." This Court can remedy that by ordering Petitioner's immediate release

5

pursuant to §3582(c)(1)(B) based on a change in the statutes or the Court's inherent authority to issue Writs pursuant to 28 U.S.C. §2243. *See, e.g., Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), stating that the District Court has the right pursuant to §2243 to reduce a prisoner's term of Supervised Release.

Under the Definitions for the First Step Act, a "prison job" qualifies an Inmate for Earned Time Credits as a "productive activity" under the Act. See § 3635(3)(C)(xi). Therefore, Petitioner as a Nonviolent Elderly Offender, was entitled to have one-third taken off his sentence and because he had a "prison job" in the kitchen at Devens, Petitioner is clearly entitled to 15 days off for 44 months.

Therefore, Petitioner respectfully suggests that under the First Step Act as well as the CARES Act, credits should be granted. In view of *U.S. v. Macfarlane,* and because of the COVID Lockdown, Petitioner is entitled to immediate release from Federal custody from the issuance of a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 2243, as well as 18 U.S.C. § 3583.

## III. EARNED TIME CREDITS UNDER THE FIRST STEP ACT

The First Step Act ("FSA"), which was enacted in December 2018, provided that all prisoners would receive 10 days, and those in a Camp or lower security facility with less of a chance of recidivism would receive an additional 5 days for a total of 15 days per month to be taken off their sentence or the period of Supervised Release. Once again, the BOP has established that there is no difference between being at a Camp, a Halfway House, or on Home Confinement, so Petitioner is undoubtedly entitled at least 22 months of Earned Time Credits. *See, e.g.,* PS5321.08, written by BOP Director Kathleen Hawk Sawyer over 20 years ago: "A CCC [Halfway House] meets the definition of a penal or correctional facility pursuant to 18 U.S.C. § 3621(b)." Perhaps the best description that Home Confinement is still "imprisonment" under the BOP's custody is Judge Ponsor's decision in *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003):

> Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially less restrictive than community confinement. For example, §3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment"* is given the opportunity to serve as much as six months of the final portion *"of the term"* in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, full time. As the Supreme Court recognized in *Koray,* the critical litmus is whether offenders "always remain subject to the control of the Bureau." *Reno v. Koray, 515* U.S. 50, 63 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned. Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment...any available penal or correctional facility," §3621(b), is, in effect, failing to "imprison" the offender when it designates him or her to a community corrections facility simply ignores §3551, which can only be read to include community confinement as a form of imprisonment, the last category of the three "authorized

sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash. *Id.* at 1029.

Therefore, Petitioner should be qualified for an additional 22 months of Earned Time Credits to eliminate his remaining time of Supervised Release pursuant to the First Step Act.

## IV. JUDGE GORTON'S CALCULATION IN MACFARLANE

In *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), Judge Gorton recognized the traditional standard that if a prisoner who was assigned to a Camp but experienced a lockdown like Petitioner did during COVID, then each week served in the lockdown was equal to a month off the inmate's sentence.

Petitioner was locked down for COVID from March of 2020 until his release to Home Confinement in August 2022. So, under the District Court's decision in *Macfarlane*, he should have at least an additional 30 months taken off of his Supervised Release based on the ratio of one week in lockdown being equal to one month off an inmate's sentence when he should have been at a Camp. *See Macfarlane* at 127 ("**...the Court determines that Macfarlane's two-week confinement in solitary quarantine in a higher security facility *is the equivalent* of two months in the Camp to which he was originally assigned.**").

As the Second Circuit stated in *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009): "**[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings.**" Id. at 199, *citing Doggett v. United States*, 505 U.S. 647, 666 (1992). In trying to craft a remedy for the Due Process violation in Ray, the Second Circuit eliminated the need for Ms. Ray **to serve any of her custodial sentence or serve her time in a Halfway House** and stated the following:

8

> "The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought." After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that 'suspension of the remainder of the sentence' is the appropriate remedy for a due process violation arising from a delayed resentencing. The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house.

*See Ray* at 202-03.

Therefore, it is clear that once a Due Process violation is discovered, as in this case, it is up to the District Court to deliver the remedy, which is why the Court in *Ray* cancelled the rest of her sentence. Petitioner respectfully asks this Court to do the same because of the Due Process violations in this case.

But Petitioner was meant to be at a Camp at FMC Devens. Based on Judge Gorton's now famous formula in *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), each week spent in Lockdown equals a month off of the Petitioner's sentence, which equates to at least another 30 months off of Petitioner's Supervised Release.

## V. PETITIONER IS ENTITLED TO RELIEF

Petitioner is actually an innocent man that was the victim of ineffective assistance of counsel detailed in different Petitions before this Court. However, even assuming that Petitioner was as guilty as the famous Defendants Ronald Filocomo or Roy William Harris, both of whom had their periods of Supervised Release terminated by the Court, the goals of Supervised Release have been reached in Petitioner's case. He has successfully reentered Society and there is no need for the Probation Office to waste valuable time and money to supervise Petitioner. Clearly it is in the interests of justice to terminate Petitioner's period of Supervised Release.

Petitioner meets all of the relevant criteria from § 3553(a) and the nine policy criteria outlined above from *Filocomo*. Also, in the famous case of Roy William Harris, who defrauded several banks of over $200,000,000, the Court in that case made several instructive observations:

> Restitution for victims is a mandated sentencing objective. However, it is fair to analyze that objective's application to the facts of a particular case. There are two noteworthy circumstances. First, the victims of Harris's fraud were a consortium of sophisticated international banks, advised by accountants and attorneys, whose existence and business activities survived the fraud. This does not excuse Harris's crimes against them, but the plight of the victims in this case cannot be mistaken for the devastated individual victims of schemers such as Bernard Madoff. Second, the government cannot reasonably expect to achieve during the balance of Harris's supervised release any meaningful redress of the banks' $200 million loss, as calculated in the restitution order. The impoverished Madoff victims may, through the efforts of various law enforcement and legal sources, achieve at least some measure of restitution and financial security. Keeping Harris's supervised release restitution obligation in effect until March 2012 will have no effect whatsoever upon the balance sheets of the bank victims. **The only practical consequence of continuing supervision for that purpose is to cripple Harris's efforts to achieve full rehabilitation through professional advancement.**

> The question posed by 18 U.S.C. § 3583(e)(1) is whether, in these circumstances, an early termination of Harris's supervised release would be "in the interest of justice." In approaching that question, I have first, as the statute commands, carefully considered the sentencing purposes set forth in § 3553(a). The magnitude of fraud and Harris's role as its architect count against him, but other sentencing purposes working in his favor tip the balance. Harris's offenses were serious but his term of imprisonment was lengthy, in accordance with the guidelines, and just. There is no need for further general deterrence. There is no need to protect the public from Harris. The desirability of Harris's continued

rehabilitation through enhanced professional opportunity trumps whatever minimal restitution might be obtained by continued supervision.

*United States v. Harris*, 689 F. Supp. 2d 692, 695–96 (S.D.N.Y. 2010).

Therefore, Petitioner's Restitution in this case should not be a barrier to the immediate termination of Petitioner's remaining period of supervised release, because the Restitution is being taken from Petitioner's Social Security check.

## VI.  IMMEDIATE RELIEF REQUESTED

Petitioner assumes that the Government will file its standard defamatory objections to Petitioner's release. Therefore, this Court should either grant immediate relief and terminate the remaining period of Petitioner's Supervised Release or issue an Order to Show Cause why relief should not be granted. Petitioner has not received any benefits or time credits from the First Step Act (FSA) despite being an Elderly White-Collar Offender and the Government is taking Restitution payments out of his Social Security check. The Government is not helping Petitioner to get back into society but is in fact actively preventing him from doing so.

## CONCLUSION

Petitioner respectfully suggests that he deserves the same Due Process considerations as the defendants in *Ray* and *Harris* received, and asks only for the Court to recognize the severe Due Process violations in this case and apply the Earned Time Credits of the First Step Act and Judge Gorton's calculation of time credits under *Macfarlane* to resentence Petitioner and to immediately terminate his remaining period of Supervised Release as was done by the Second Circuit in *Ray*, or to take off his remaining Supervised Release pursuant to 18 U.S.C. § 3583.

Respectfully submitted,

/ s / Edward J. Mackenzie
Edward J. Mackenzie
Petitioner, *pro se*
65 Backlund Drive
Brockton MA., 02302

# CERTIFICATION

I hereby certify that on this nineteenth day of August 2024, a copy of the foregoing was filed with the Clerk of the Court.

/ s / Edward J. Mackenzie
Edward J. Mackenzie
Petitioner, *pro se*
65 Backlund Drive
Brockton MA., 02302